# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**KATHERINE MARIE DILLABER**
**Individually On Her Own Behalf**

**and**

**JOHN DILLABER**
**Individually On His Own Behalf**

**and**

**ANNE YOUNGBLOOD**
**Individually On Her Own Behalf**

**and**

**ESTATE OF JACQUELINE DILLABER**
**By Anne Youngblood, Legal Representative**

**and**

**ESTATE OF PHILIP DILLABER**
**By Anne Youngblood, Legal Representative**

**and**

**MARY JO CLARKE**
**Individually on Her Own Behalf**

**and**

**THOMAS CLARKE, JR.**
**Individually on His Own Behalf**

      **Plaintiffs,**

**v.**                                                                 **Civil No.**

**ISLAMIC REPUBLIC OF IRAN**
**Ministry of Foreign Affairs**
**Khomeini Avenue**

**United Nations Street**
**Tehran, Iran**

**and**

**IRANIAN MINISTRY**
**OF INFORMATION AND SECURITY**
**Pasdaran Avenue**
**Golestan, Yekom**
**Tehran, Iran**

**and**

**KINGDOM OF SAUDI ARABIA**
**Ministry of Foreign Affairs**
**Alnassryah Street**
**Riyadh, Saudi Arabia 11544**

    **Defendants.**

## COMPLAINT

Plaintiffs, by and through undersigned counsel, bring this action seeking damages arising out of the September 11, 2001, terrorist attacks on the  United States ("the September 11th Attacks" or "9/11"). Plaintiffs allege that the Defendants, the Islamic Republic of Iran ("Iran"), its agency and instrumentality the Ministry of Information and Security ("MOIS"), and the Kingdom of Saudi Arabia ("Saudi Arabia" or "the Kingdom"), were responsible for the terrorist attacks.

Plaintiffs are legally entitled to assert these claims pursuant to the Foreign Sovereign Immunities Act (28 U.S.C. § 1602 *et seq*.), as amended by § 1083 of the Defense Appropriations Act of 2008, H.R. 4986, Pub. L. No. 110-181 and by § 3(a) of the Justice Against Sponsors of Terrorism Act ("JASTA"), S. 2040, Pub. L. No. 114-222, 130 Stat. 852, (enacting 28 U.S.C. § 1605B); the Anti-Terrorism Act (18 U.S.C. § 2333 et seq.); and the laws of the jurisdictions of residence of those Plaintiffs suffering injuries as hereinafter alleged.

**INTRODUCTION**

(1)     On September 11, 2001, nineteen members of the terrorist organization al Qaeda, fifteen of whom were citizens of Saudi Arabia, hijacked four commercial airliners and used them as weapons in a coordinated terrorist attack upon the United States and its citizens. The attacks killed over 3,000 people that day and injured many thousands more.

(2)     The September 11th Attacks represented a single targeted operational strike, carried out as part of al Qaeda's broader ongoing campaign to wage jihad against the United States.

(3)     Al Qaeda's ability to conduct large-scale terrorist attacks was the direct result of the support al Qaeda received from its material sponsors and supporters, including Iran, MOIS, and Saudi Arabia.

(4)     Plaintiffs allege that Iran, MOIS, and its associated terrorist group, Hezbollah, forged alliances with Osama bin Laden and al Qaeda for the purpose of working together against their perceived common enemy, the United States.

(5)     Plaintiffs allege that Iran acted through its officials, officers, agents, employees, agencies and instrumentalities, including Hezbollah, in providing support and resources to al Qaeda. The support provided by Iran included assisting and contributing to the preparations and execution of the plans that culminated in the September 11th Attacks.

(6)     Plaintiffs allege that Saudi Arabia established, funded, directed and controlled da'awa (Arabic for proselytizing) organizations (a.k.a. "charities") to propagate Wahhabi Islam throughout the world, as a core function of the Saudi state under the supervision of Saudi Arabia's Ministry of Islamic Affairs and embassies and consulates outside of Saudi Arabia, and that the da'awa organizations were responsible for providing the funding and material support

that allowed Osama bin Laden and al Qaeda to acquire the capabilities employed by al Qaeda on

September 11, 2001, and acted as agents and alter egos of the Saudi government in doing so.

(7)     Plaintiffs further allege that individual employees, officials, and agents of the government

of Saudi Arabia knowingly provided direct assistance to the September 11th hijackers and al

Qaeda organization, while acting in the performance of their duties in promoting the anti-western

and anti-American agenda of Saudi Arabia's Ministry of Islamic Affairs.

(8)     Plaintiffs further allege that Saudi Arabia's Ministry of Islamic Affairs and related

components of Saudi Arabia's vast government apparatus, established to proselytize Wahhabi

Islam, knowingly channeled extensive funds and material support to al Qaeda through the

da'awa organizations and other platforms under their control.

(9)     Absent the support of Iran and Saudi Arabia, and their agencies, instrumentalities,

employees and officers, al Qaeda would not have had the capacity to conceive, plan, and execute

the September 11th Attacks.

## PARTIES

(10)     On the morning of September 11, 2001, Plaintiff Katherine Dillaber and her sister,

Patricia Dillaber Mickley, both civilian employees of the U.S. Department of Defense, were

working in their offices in the Pentagon when American Airlines Flight #77 crashed into the

western side of the building after being hijacked by al Qaeda terrorists. The offices in which

Patricia Dillaber Mickley and Plaintiff Katherine Dillaber worked were destroyed by the

explosion. Plaintiff Katherine Dillaber sustained injuries but escaped to safety. Patricia Dillaber

Mickley was killed in the attack.[1]

---

[1] The Estate of Patricia Dillaber Mickley is not a party in this case.

(11)    Plaintiff Katherine Dillaber, a resident of the State of Virginia, was injured by an act of "torture" as defined in 28 U.S.C. § 1605A(a) and the Torture Victims Protection Act, 28 U.S.C. §1350, as a result of the September 11th Attacks. Plaintiff Katherine Dillaber brings this action on her own behalf and as the Sibling of Patricia Dillaber Mickley, who was killed in the September 11th Attacks, and is entitled to recover damages on the causes of action set forth herein.

(12)    Plaintiff John Dillaber is a resident of the State of Virginia. He is the brother of Katherine Dillaber, who was injured in the September 11th Attacks, and Patricia Dillaber Mickley, who was killed in the September 11th Attacks. He brings this action on his own behalf as the Sibling of Katherine Dillaber and Patricia Dillaber Mickley and is entitled to recover damages on the causes of action set forth herein.

(13)    Plaintiff Anne Youngblood is a resident of the State of Virginia. She is the sister of Katherine Dillaber, who was injured in the September 11th Attacks, and Patricia Dillaber Mickley, who was killed in the September 11th Attacks. She brings this action on her own behalf as the Sibling of Katherine Dillaber and Patricia Dillaber Mickley and is entitled to recover damages on the causes of action set forth herein.

(14)    Plaintiff Jacqueline Dillaber, now deceased, was a resident of the State of Virginia. She was the Mother of Katherine Dillaber, who was injured in the September 11th Attacks, and Patricia Dillaber Mickley, who was killed in the September 11th Attacks. Plaintiff Anne Youngblood, the Personal Representative of her Estate, brings this action and is entitled to recover damages on the causes of action set forth herein.

(15)    Plaintiff Philip Dillaber, now deceased, was a resident of the State of Virginia. He was the Father of Katherine Dillaber, who was injured in the September 11th Attacks, and Patricia

Dillaber Mickley, who was killed in the September 11th Attacks. Plaintiff Anne Youngblood, the Personal Representative of his Estate, brings this action and is entitled to recover damages on the causes of action set forth herein.

(16)    Plaintiff Mary Jo Clarke and her husband, Thomas Clarke, residents of the State of Minnesota, provided volunteer first responder services at the World Trade Center attack site from approximately September 13, 2001 through December 2001. Plaintiff Mary Jo Clarke and her husband, Thomas Clarke, were exposed to smoke, dust, toxic chemicals and other hazardous materials for the duration of their response work and have suffered severe illnesses therefrom.[2] They have one son, Plaintiff Thomas Clarke, Jr., whose life was tragically altered by the September 11th Attack.

(17)    Plaintiff Mary Jo Clarke was injured by an act of "torture" as defined in 28 U.S.C. § 1605A(a) and the Torture Victims Protection Act, 28 U.S.C. §1350, as a result of the September 11th Attacks. Plaintiff Mary Jo Clarke brings this action on her own behalf, as the Spouse of Thomas Clarke, and as the Mother of Thomas Clarke, Jr., who were injured in the September 11th Attacks, and she is entitled to recover damages on the causes of action set forth herein.

(18)    Plaintiff Thomas Clarke, Jr., is a resident of the State of Minnesota. He is the son of Plaintiff Mary Jo Clarke and Thomas Clarke, both of whom were injured in the September 11th Attacks. He brings this action on his own behalf as the Child of Plaintiff Mary Jo Clarke and Thomas Clarke and is entitled to recover damages on the causes of action set forth herein.

(19)    Defendant Islamic Republic of Iran is a foreign sovereign state within the meaning of 28 U.S.C.  § 1603(a). Iran is now and has been designated a state sponsor of terrorism pursuant to

---

[2] Thomas Clarke is not a party in this case.

Section 6(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) and § 620A of the

Foreign Assistance Act of 1961 (22 § U.S.C. 2371) since January 19, 1984.

(20)     Defendant Iranian Ministry of Information and Security (MOIS) is an agency of

Defendant Iran, whose activities included, at all times relevant to this action, the prosecution of

terrorist acts directed against the armed forces of the United States and United States citizens, by

and through material support to various terrorist organizations including Hezbollah. MOIS has

been found to be an instrumentality of Iran for purposes of liability and damages under the

Foreign Sovereign Immunities Act.

(21)     Defendant Kingdom of Saudi Arabia is a foreign state within the meaning of 28 U.S.C. §

1603(a). The Kingdom of Saudi Arabia maintains an Embassy within the United States at 601

New Hampshire Avenue NW, Washington, D.C. 20007.

## JURISDICTION AND VENUE

(22)     Venue in this Court is proper in accordance with the provisions of 28 U.S.C. § 1391(f)(4)

and 18 U.S.C. § 2334(a).

(23)     Jurisdiction arises pursuant to 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), the Foreign

Sovereign Immunities Act (28 U.S.C. § 1602 *et seq*.), and 18 § U.S.C. 2333.

(24)     As herein alleged, actions for personal injury and related torts perpetrated by foreign state

Defendants Iran and Saudi Arabia, through their agencies and instrumentalities, and through their

officials, employees and agents, fall within the exceptions to jurisdictional immunity under 28 §§

U.S.C. 1605(a)(5), 1605A, and 1605B.

(25)     28 U.S.C. § 1605(a)(5) is the non-commercial torts exception to sovereign immunity. It

provides a cause of action against a foreign state for personal injury or death, or damage to or

loss of property, occurring in the United States as a result of tortious acts of a foreign state or its

employee, acting within the scope of his or her employment. The exception does not apply to claims based on discretionary acts, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

(26)     28 U.S.C. § 1605A is the terrorism exception to sovereign immunity. It provides a federal private right of action against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment, or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing, or the provision of material support and resources for such acts. This cause of action is available to U.S. nationals, foreign nationals who were killed or injured while acting within the scope of their employment for the U.S. government, members of the armed services, and immediate family members of victims in each of the aforementioned categories.

(27)     28 U.S.C. § 1605B was enacted by the Justice Against Sponsors of Terrorism Act ("JASTA"), S. 2040, Pub. L. No. 114-222, 130 Stat. 852, for the purpose of providing a jurisdictional grant for plaintiffs to pursue claims against Saudi Arabia for its involvement in the September 11th Attacks. It provides a cause of action against a foreign state for injury and death caused by an act of "international terrorism" occurring *inside* the United States, as defined in 18 U.S.C. § 2331, where plaintiffs can show that the injuries and deaths were caused by a tortious act or acts of a foreign nation, and that the act or acts constitute more than mere negligence, and were intentional, knowing, reckless, willful and/or grossly negligent.

(28)     Pursuant to 28 U.S.C. § 1605B(c), a national of the United States may bring a claim against a foreign state in accordance with 18 U.S.C. § 2333, the Anti-Terrorism Act ("ATA").

(29)    The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs may sue thereof in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

(30)    JASTA further amended the ATA by clarifying that in any action for an injury arising from an act of international terrorism, liability may be asserted as to any person who aids and abets an organization that had been designated as a foreign terrorist organization by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

(31)    The amendments made by JASTA specifically apply to any civil action arising out of an injury to a person, property, or business on or after September 11, 2001.

(32)    Wherever the common or statutory law of a Plaintiff's residence contains rights or makes further damages available that are not duplicative of the recovery afforded under the statutory schemes listed above, Plaintiffs have causes of action under the common or statutory law of the U.S. state or foreign country where they were domiciled at the time of the attack.

## OVERVIEW OF ATTACKS

(33)    On September 11, 2001, nineteen members of the al Qaeda terrorist organization hijacked four commercial airliners and used those planes as weapons in a coordinated terrorist attack upon the United States. The hijackers caused two jets to crash into the World Trade Center Towers in New York City, and a third to crash into the Pentagon building in Arlington County, Virginia. The fourth airliner crashed into a field near the town of Shanksville, Pennsylvania, after passengers challenged the hijackers and prevented them from reaching Washington, D.C., where they may have planned to attack the U.S. Capitol or the White House.

(34)    At the time of the September 11th Attacks, al Qaeda was a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

(35)    The September 11th Attacks resulted in the tragic loss of over 3,000 lives, physical and emotional injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center Complex and the partial collapse of the Pentagon building's western side.

(36)    The September 11th Attacks were an "act of international terrorism" within the meaning of 18 U.S.C. § 2331.

(37)    As confirmed by countless investigations, the September 11th Attacks were the culmination of more than a decade-long campaign by al Qaeda to carry out large-scale terrorist attacks against the United States, set in motion by the formation of al Qaeda in 1989.

(38)    As further detailed below, Defendants provided material support to al Qaeda for more than a decade leading up to the September 11th Attacks, with knowledge of al Qaeda's intent to conduct terrorist attacks against the United States, and an awareness that al Qaeda would use the support provided by the Defendants to achieve that objective.

(39)    As further detailed below, the support provided by the Defendants enabled al Qaeda to obtain the global strike capabilities necessary to carry out the September 11th Attacks, and was essential to the success of those attacks. Indeed, the material support provided to al Qaeda by employees, agents, and alter-egos of the Iranian and Saudi Arabian governments, all of which is attributable to those governments themselves, included direct assistance to the September 11th plotters and hijackers and the massive funding and logistical support that enabled Osama bin Laden to build and sustain the al Qaeda organization.

(40)     In the years since the September 11th Attacks, there have been numerous reports and investigations which have yielded evidence in support of the claims set forth herein: the Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission"), the findings of the Congressional Joint Inquiry Into the Terrorist Attacks of September 11, 2001 ("Congressional Joint Inquiry" or "CJI"), the so-called "missing pages" or "28 pages" of the Congressional Joint Inquiry, which have been made public, and a 2012 report concerning the status of the ongoing criminal investigation by the Federal Bureau of Investigation ("FBI") and the U.S. Department of Justice ("DOJ") of Saudi government employees and agents who provided substantial assistance to the hijackers ("2012 Summary Report"), among others.

## BACKGROUND ON AL QAEDA

(41)     Al Qaeda Islamic Army ("al Qaeda") is an unincorporated association and terrorist organization dedicated to the destruction of the United States, Israel and its citizens.

(42)     Al Qaeda uses violence, bombings, murder, mayhem, and other terrorist tactics in order to pursue its unlawful objectives.

(43)     Al Qaeda was founded by Osama bin Laden in or about 1989.

(44)     Osama bin Laden was the "emir" (prince) of al Qaeda and was its leader at all relevant times. Members of al Qaeda pledged an oath of allegiance (a "bayat") to Osama bin Laden and al Qaeda.

(45)     From 1989 until about 1997, al Qaeda was headquartered in Afghanistan and Pakistan. In or about 1991, the leadership of al Qaeda, including bin Laden, relocated to Sudan. Al Qaeda was headquartered in Sudan from approximately 1991 until approximately 1996, but also maintained a presence and activities in other parts of the world.

(46)    In 1996, under pressure from the United States and others to crack down on terrorism, Sudan exiled bin Laden. Al Qaeda returned to Afghanistan.

(47)    Bin Laden and al Qaeda violently opposed the United States for several reasons. First, the United States was regarded as an "infidel nation" because it was not governed in a manner consistent with the group's extremist interpretation of Islam. Second, the United States was viewed as providing essential support for other "infidel" governments. Third, al Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, al Qaeda opposed the continued presence of American military forces in Saudi Arabia following the Gulf War. Fourth, al Qaeda opposed the United States government because of the arrest, conviction, and imprisonment of persons belonging to al Qaeda or its affiliated terrorist groups or those with whom it worked.

(48)    For these and other reasons, bin Laden declared jihad, or holy war, against the United States, which he carried out through al Qaeda and its affiliated organizations.

(49)    At all relevant times, al Qaeda functioned both on its own and through terrorist organizations operated under its umbrella, including Egyptian Islamic Jihad, which was led by Ayman al Zawahiri; the Islamic Group (also known as "el Gama'a el Islamiyya"), and a number of jihad groups in other countries, including Sudan, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, the Kashmir region of India, and the Chechnyan region of Russia.

(50)    Al Qaeda also maintained cells and personnel in a number of countries to facilitate its activities, including Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

(51)     Al Qaeda had a command and control structure which included a "majlis-ash-shura" (consultation council) which discussed and approved major undertakings, including terrorist operations. Al Qaeda also had a military committee, which considered and approved "military" matters.

(52)     At relevant times, bin Laden and al Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan. Those camps were used to instruct members and associates of al Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train al Qaeda members in security and counter-intelligence methods, such as the use of codes and passwords, and to teach members and associates of al Qaeda about traveling to perform operations. For example, al Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its members and associates to monitor media reports of its operations to determine the effectiveness of their terrorist activities.

(53)     One of the principal goals of al Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Arabian peninsula) and Somalia through the use of violence. These goals eventually evolved into a declaration of jihad against America and all Americans. Members of al Qaeda issued fatwahs indicating that such attacks on Americans were both proper and necessary.

(54)     Al Qaeda and bin Laden used terrorism as a tool to be used to further political objectives. Al Qaeda has, over the years, directly carried out murders, bombings, and other terrorist acts

against its enemies. It has also provided direct and indirect support to other international terrorist groups and received support in return, often in the form of money, training, sanctuary, documentation, intelligence, weapons, and other types of assistance.

(55)     Al Qaeda has often used operatives such as the hijackers to actively engage in terrorist activities against the United States and its citizens. In conducting those terrorist activities, al Qaeda received financial, logistical, and other material support from defendants Iran, Saudi Arabia, and their agencies and instrumentalities.

## IRAN'S LIABILITY FOR THE 9/11 ATTACKS

(56)     Iran has been waging an undeclared war against the United States and Israel for over thirty years. Iran wages this war through asymmetrical, or unconventional, strategies and terrorism, often through proxies such as Hezbollah, Hamas, al Qaeda, and others.

(57)     In 1984, the U.S. State Department added Iran to the list of designated state sponsors of terrorism, and it has been so designated every year since.

(58)     Iran has repeatedly been found liable for deaths and injuries caused by its activities as a state sponsor of international terrorism under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.,* especially in connection with acts perpetrated by Hezbollah.

(59)     Iran's involvement in international terrorism has been documented in a long line of cases in the U.S. District Court for the Southern District of New York and the U.S. District Court for the District of Columbia, including *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009), *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010), and *Havlish v. bin Laden*, 2012 WL 3090979 (S.D.N.Y. 2012).

(60)     Since the time Iran was designated as a state sponsor of terrorism by the U.S. State Department, evidence has been collected and analyzed which shows conclusively that Iran views

terrorism as an instrument of state policy, like diplomacy or military power, which can and should be used to further political objectives. The evidence shows that Iran has, over the years, directly carried out assassinations, bombings, and other terrorist acts against its enemies through its terrorist proxy, Hezbollah. It has also provided direct and indirect support to international terrorist groups in the form of money, training, sanctuary, documentation, intelligence, and other types of assistance, including to al Qaeda.

(61)     The political structure of Iran is divided: there is a formal governmental structure and a revolutionary structure. Both structures are overseen by the unelected Supreme Leader, Ayatollah Ali Hoseini Khamenei. The Supreme Leader has the power to dismiss the president, overrule the parliament and the courts, and overturn any secular law.

(62)     To carry out its policy of terrorism and support for terrorist groups, Iran has created and used government organizations including the Ministry of Information and Security ("MOIS"), other intelligence ministries, the militaries, and various types of quasi-governmental companies and entities which are directly answerable to, and receive instruction from, the Islamic power regime in Iran.

(63)     As described herein, Iran acted through its officials, officers, agents, employees, agencies and instrumentalities in providing direct and material support, and resources, to al Qaeda. The support provided by Iran included assisting and contributing to the preparations and execution of the plans that culminated in the September 11th Attacks.

(64)     Defendant MOIS is a political subdivision of the Islamic Republic of Iran. This agency has core functions which are governmental, not commercial, in nature. This agency was established by law; its head is appointed by the President and subject to confirmation by the

parliament; its budget is proposed by the president and approved by the parliament, and its funding comes almost entirely from general tax revenues.

(65)    MOIS is a well-funded and skilled intelligence agency with an annual budget of between $100 million and $400 million. MOIS has been a key instrument of the government of Iran for its material support of terrorist groups like Hezbollah and as a terrorist agency of the Iranian government.

(66)    Many of the U.S. State Department's reports on global terrorism over the past 25 years refer to MOIS as Iran's key facilitator and director of terrorist attacks.

(67)    MOIS has been found to be an instrumentality of Iran for purposes of liability and damages under the Foreign Sovereign Immunities Act. *See*, e.g., *Sutherland v. Islamic Republic of Iran*, 151 F. Supp.2d 27, 53 n. 6 (D.D.C. 2001).

(68)    With a large budget and extensive organization, MOIS is one of the most powerful ministries in the Iranian government.

(69)    Unlike MOIS, the Islamic Revolutionary Guard Corps ("IRGC") is a military force parallel to the regular Iranian military and to the formal governmental structure. Its responsibilities are described in the Iranian Constitution, and it reports directly to Iran's Supreme Leader rather than to the President. It is both the guardian and the striking arm of the Islamic Revolution.

(70)    The IRGC's special forces division, known as the *Qods* Force, has provided training and funding for terrorism operations targeting American citizens, including support for Hezbollah and al Qaeda, for at least two decades. Terrorism training provided to Hezbollah and al Qaeda by the IRGC is an official policy of the Iranian government.

(71)    The entire apparatus of the Iranian state and government, and many parts of Iran's private

sector, including corporations, banks, state-run media, private individuals, and even charities, are

at the service of the Supreme Leader, the IRGC, and MOIS when it comes to support of

terrorism. The IRGC and MOIS are responsible for carrying out the policies of the Iranian

government, and the Iranian government's policies include state support for terrorism. Although

much of that state support is done through clandestine means, the government ministries have

also been involved in state support for terrorism, generally, and in support for al Qaeda and

Hezbollah.

### Iran's Sponsorship of Terrorism and al Qaeda

(72)    For many years, the U.S. State Department has included Iran on its list of state sponsors

of terrorism, going as far as describing Iran as "the most active" state sponsor of terrorism.

(73)    At relevant times, Iran provided material support to bin Laden and al Qaeda, often

through Hezbollah. That support included advice and assistance in planning operations against

American targets, as well as financial and logistical support for particular operations, including

the September 11th Attacks.

(74)    Imad Mughniyah was an agent of the Iranian regime and the terrorist operations chief of

Hezbollah. Since the early 1980s, Mughniyah was affiliated with the Islamic regime in Iran and

lived in Iran for many years. Mughniyah had a direct reporting relationship to Iranian

intelligence and a direct role in Iran's sponsorship of terrorist activities.

(75)    While Osama bin Laden and al Qaeda were headquartered in Sudan in the early 1990s,

noted Islamist leader of the National Islamist Front, Hassan al Turabi, fostered the creation of a

foundation and alliance for combined Sunni and Shi'a Muslim opposition to the United States

and the West, an effort that was agreed to and joined by bin Laden and Ayman al Zawahiri, leaders of al Qaeda, and by the leadership of Iran.

(76)     The well-known historical religious division between Sunni and Shi'a Muslims did not pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists. Iran, which is largely Shiite, and Hezbollah, also Shiite, entered into an alliance with al Qaeda, which is Sunni, to work together to conduct terrorist operations against the United States during the 1990s and continuing through, and after, September 11, 2001.

(77)     In 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an agreement to cooperate in providing support for actions carried out primarily against Israel and the United States. Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hezbollah.

(78)     On October 31, 1991, Iran hosted the International Conference for the Support of the Muslim Palestinian People's Revolution, which was attended by radical Palestinian groups, both Islamic and secular. The conference established a permanent secretariat, funded by Iran, to coordinate pro-intifada activities. In doing so, Iran tightened its ties to the radical groups Palestinian Hamas and Islamic Jihad.

(79)     At various times in or about 1992 and 1996, bin Laden and other ranking members of al Qaeda made it known that they favored a policy under which al Qaeda would put aside its differences with Shiite Muslim terrorist organizations, including the government of Iran and Hezbollah, to coordinate attacks against their perceived common enemy, the United States.

(80)     On or before 1994, al Qaeda forged an alliance with the National Islamist Front of Sudan and with representatives of the government of Iran and Hezbollah, for the purpose of working together against the United States and other perceived common targets.

(81)     Hezbollah is funded, directed, and controlled by the Iranian government. The amounts of Iranian government contributions to Hezbollah have varied over the years, ranging from an estimated $15-20 million dollars annually, to as much as $150-300 million dollars annually. Sheikh Subhi al-Tufeili, Hezbollah's first leader, stated:

> To deny the Iranian connection to Lebanon's Hezbollah would be like denying that the sun provides light to the earth. Who can deny such a thing?

(82)     Hezbollah's manifesto, as declared by Hezbollah's spokesman, Sheik Ibrahim al-Amin, states:

> We, the sons of Hezbollah's Nation in Lebanon, whose vanguard God has given glory in Iran and which has established the nucleus of the world's central Islamic state, abide by the orders of a single wise and just command currently embodied in the supreme examples of Ayatollah Khomeini.
>
> From this basis, we in Lebanon are not a closed organizational structural party, nor are we a narrow political framework, but we are a nation interconnecting with all Muslims of the World. We are linked by a strong ideological and political connection – Islam.
>
> From here what befalls the Muslims in Afghanistan, Iraq, the Philippines or anywhere else verily afflicts the body of our own Islamic nation of which we are an inseparable part, and moved to confront it on the basis of our main legal obligation in light of the political view decided by our leader Wilayat al-Faqih [Ayatollah Khomeini].

(83)     In 1993, in a meeting in Khartoum, Sudan, arranged by Ali Mohamed, a confessed al Qaeda terrorist and trainer who is now in U.S. prison, Osama bin Laden and Zawahiri met directly with Iran's master terrorist, Mughniyah, and Iranian officials, including IRGC Brigadier

General Mohammad Baqr Zolqadr, a highly placed member of the Iranian terrorism apparatus.

At the 1993 Khartoum conference, representatives of Iran, Hezbollah, and al Qaeda worked out

an alliance of joint cooperation and support on terrorism. Ali Mohamed, who was charged with

the 1998 bombing of the U.S. Embassies in Kenya and Tanzania, testified as following during

his guilty plea hearing on October 20, 2000:

> I was aware of certain contacts between al Qaeda and al Jihad
> organization, on one side, and Iran and Hezbollah on the other
> side. I arranged security for a meeting in the Sudan between
> Mughniyah, Hezbollah's chief, and bin Laden. Hezbollah provided
> explosives training for al Qaeda and al Jihad. Iran supplied
> Egyptian Jihad with weapons. Iran also used Hezbollah to supply
> explosives that were disguised to look like rocks.

(84)    The 1993 meeting in Khartoum led to an ongoing series of communications, training

arrangements, and operations among Iran, Hezbollah, and al Qaeda. Bin Laden sent more

terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC in

Lebanon and Iran. Among other tactics, Hezbollah taught bin Laden's al Qaeda operatives how

to bomb large buildings, and Hezbollah also gave the al Qaeda operatives training in intelligence

and security.

(85)    Throughout the 1990s, the al Qaeda/Iran/Hezbollah terrorist training arrangement

continued. Mughniyah himself coordinated these training activities, including training of al

Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working

undercover at the Iranian embassy in Beirut, Lebanon.

(86)    As a result of the creation of this terrorist alliance, al Qaeda's Zawahiri repeatedly visited

Tehran during the 1990s and met with MOIS officers, including chief Ali Fallahian, and *Qods*

Force chief Ahmad Vahidi.

(87)   At all times, Iran's Supreme Leader, Ayatollah Khamenei, was fully aware that Iran and Hezbollah were training foreign terrorists.

(88)   On June 7, 1996, Ayatollah Khamenei declared that Hezbollah must "reach all continents and all countries."

(89)   In early June 1996, Iran organized a pan-Islamic summit which had a primary objective of establishing an international coordination committee to oversee anticipated escalation in hostilities. Ayatollah Ahmad Jannati, a close associate of Ayatollah Khamenei, emerged as the official spokesperson for the working group. The meeting was organized jointly by the Supreme Council for Intelligence Affairs and IRCG high command. Attending the working group were the following: Ramadan Shallah (head of Palestinian Islamic Jihad); Mamdouh Mahmoud Salim (Egyptian Islamic Jihad); Imad Mughniyah (Hezbollah); Muhammad Ali Ahmad (a representative of al Qaeda and Osama bin Laden); Ahmad Jibril (head of the Popular Front for the Liberation of Palestine-General Command); Imad al-Alami and Mustafa al-Liddawi (HAMAS); and Abdullah Ocalan (Kurdish People Party). The summit participants agreed on the unification of their financial system and training.

(90)   In or about July of 1996, Osama bin Laden met with an Iranian intelligence official in Afghanistan.

(91)   In early October 1996, Osama bin Laden visited Tehran for consultations. One of the issues addressed was the unification of various Egyptian terrorist organizations. Ali Fallahian, Minister of MOIS, chaired the meeting with representatives from the Iranian Ministry of Interior, Islamic Guidance Ministry, and the Iranian Foreign Ministry. Among the Egyptians attending were the Tehran-based aide of Zawahiri, Kamal Ujayzah, and Mustafa Hamzah. The Iranians discussed specific long-term operational plans and explained to the Egyptian attendees that the

degree of Iran's support depended on the extent of their unity. The Egyptian attendees agreed to form a unified command with Osama bin Laden for operational purposes.

(92)    In or about mid-September 1997, Iranian leadership met to discuss the new course of the anti-American struggle. The participants included Iran's Supreme Leader Ayatollah Khameini. Also present were newly-elected president Mohammad Khatami, former president Ali Akhbar Hashemi-Rafsanjani, and the minister of intelligence, Qurban Ali Dari Najafabadi. Other participants in this conference were: General Rahim Safavi (the Commander-in-Chief of the IRGC); General Moshen Rezai (former Commander in Chief of IRGC, now responsible for reorganizing the Iranian security services and their networks); Ali Fallahian (former intelligence minister); Mohammed Mohammadi Rayshahri (former intelligence minister, present as Khamenei's special adviser on intelligence affairs); Hoseein Sheikh-ol-Islam (Iran's former deputy foreign minister and once again director of the Office of Liberation Movements); Ali Akbar Mohtashemi; General Diya Sayfi (the commander of the IRGC forces in Lebanon); members of the Supreme National Security Council; and senior IRGC and intelligence officials.

(93)    In or about September 20-23, 1997, Iranian intelligence organized a major summit of terrorist leaders from all over the world. Among the participants were: Imad Mughniyah and Abdul-Hadi Hammadi (Hezbollah); Ayman al Zawahiri (Egyptian Islamic Jihad); Ahmad Jibril (chief of the Popular Front for the Liberation of Palestine-General Command PFLP-GC); Osama Abu-Hamden and Imad al-Alami (HAMAS); Ramadan Shallah (chief of Palestine Islamic Jihad); and three commanders representing branches of Hezbollah in the Persian Gulf States.

(94)    Participants at the summit examined the Islamists ability to escalate terrorism against the United States and the West. Several senior Iranian officials addressed the summit and ordered the terrorist leaders to be ready to launch an unprecedented international terrorist campaign.

(95)     In or about late September 1997, the Iranian leadership met again to discuss the course of the forthcoming terrorism offensive in light of the resolutions and findings of the recent international terrorist summit.

(96)     In the second half of November 1997, Ayatollah Khamenei convened a meeting with General Rahim Safavi and Ahmad Vahidi to discuss the establishment of a new elite terrorist force to carry out spectacular but deniable terrorist attacks against the United States and the West.

(97)     Al Qaeda telephone bills of international calls between 1996 and 1998 were analyzed by United States investigators, showing that nearly 10 percent of the outgoing calls from Afghanistan were made to Iran.

(98)     The creation of the Iran/Hezbollah/al Qaeda terrorist alliance, which began in the early 1990s, and during which Hezbollah terror chief Imad Mughniyah oversaw the training activities of members of various terrorist groups until his death in 2008, resulted in a string of deadly terrorist strikes aimed directly at the U.S. and its allies. Among these terrorist attacks were the following: in March 1992, a Hezbollah terrorist team operating under Mughniyah's command bombed the Israeli embassy in Buenos Aires, Argentina; on February 26, 1993, al Qaeda operatives bombed the World Trade Center; a few months later, an al Qaeda conspiracy to bomb several New York City landmarks, including the Lincoln Tunnel and the Holland Tunnel, was disrupted; in July 1994, Mughniyah and a Hezbollah team, under the direction of Iran, MOIS, and the IRGC, truck bombed the *Asociación Mutual Israelita Argentina* ("AMIA"), the Jewish cultural center in Buenos Aires; in December 1994, Algerian terrorists associated with al Qaeda hijacked a French airliner, intending to crash it into the Eiffel Tower in Paris, a precursor to 9/11; on July 7, 1995, Ayman al Zawahiri's Egyptian gunmen, supported, trained, and funded by Iran,

attempted to assassinate Egyptian President Hosni Mubarak in Ethiopia; on June 25, 1996, Saudi

Hezbollah terrorists, acting on directions from Iran and under planning by the IRGC *Qods* Force

commander, and with assistance from al Qaeda, truck bombed the Khobar Towers housing

complex in Dhahran, Saudi Arabia, where U.S. military servicemen were quartered; on August 7,

1998, two simultaneous attacks, carried out by al Qaeda under the direction of Iran, MOIS, and

the IRGC, and with training by Hezbollah, destroyed the U.S. Embassies in Nairobi, Kenya, and

Dar es Salaam, Tanzania; on October 12, 2000, al Qaeda suicide bombers attacked the U.S.S.

Cole in the harbor of Aden, Yemen.

(99)     Iran was directly linked to the 1996 Khobar Towers bombing. The indictment against

Ahmed Al-Mughassil and others states:

> From some time in the 1980s until the date of filing of this
> Indictment, [Hizballah], or "Party of God" was the name used by a
> number of related terrorist organizations operating in Saudi Arabia,
> Lebanon, Kuwait, and Bahrain, among other places. These
> [Hizbollah] organizations were inspired, supported, and directed
> by elements of the Iranian government. Saudi Hizballah Al-Hijaz,
> was a terrorist organization that operated primarily in the Kingdom
> of Saudi Arabia and that promoted, among other things, the use of
> violence against nationals and property of the United States located
> in Saudi Arabia. Because Saudi Hizballah was an outlaw
> organization in the Kingdom of Saudi Arabia, its members
> frequently met and trained in Lebanon, Syria, or Iran.

(100)   According to the DOJ, information was provided to Iranian officials about the planned

Khobar operation by Saudi Hezbollah. Additionally, an Iranian military officer directed the

plotters to surveil sites for attacks against Americans, and the Saudi Hezbollah leader asserted

that he enjoyed close ties to Iranian officials who were providing his group with financial

support.

(101)   According to the U.S. State Department's *Patterns of Global Terrorism 2000*, Iran

remained the most active state sponsor of terrorism in 2000. It provided increasing support to

numerous terrorist groups, including Lebanese Hezbollah, Hamas, and the Palestine Islamic

Jihad (PIJ), which seek to undermine the Middle East peace negotiations through the use of

terrorism.

(102)   The U.S. State Department's *Patterns of Global Terrorism 2000* also stated that Iran's

"Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS)

continued to be involved in the planning and execution of terrorist acts and continued to support

a variety of groups that use terrorism to pursue their goals."

(103)   In January 2001, Ayman al Zawahiri and other al Qaeda leaders met with Iranian

intelligence officials at a mountain guesthouse near the town of Varamin, just south of Tehran.

(104)   The Iranian delegation was headed by Hojjat-ol eslam Ali Akbar Nateq-Nouri and

included Imad Mugniyeh. The purpose of the meeting was to plan and coordinate Iranian support

for an upcoming al Qaeda operation against the United States.

(105)   On May 4, 2001, a second planning meeting between al Qaeda and Iranian intelligence

officials was held in Iran. Attendees at this planning meeting included Ayatollah Khamenei, Ali

Akhbar Hashemi-Rafsanjani, and Osama bin Laden's son, Saad bin Laden. Iranian intelligence

memos written in the weeks following the meeting advise Iranian operatives to be prepared for

U.S. retaliation for an attack planned for September 2001.

## Iran Had Knowledge of the September 11th Attacks

(106)   During the mid-to-late 1980s, Iran began formulating contingency plans for asymmetrical

or unconventional warfare against the United States, including terrorist operations. These

contingency plans were code-named "*Shaitan dar Atash*."

(107)   One of the "Shaitan dar Atash" contingency plans was for the hijacking of the U.S. commercial airliners and crashing them into buildings, particularly in New York City and Washington, D.C.  This contingency plan became the blueprint for the September 11th Attacks.

(108)   Defendants Iran and MOIS has actual foreknowledge of, and were complicit in the planning and coordination of the 9/11 attacks upon the United States which were carried out by members of al Qaeda under the direction of Osama bin Laden.

(109)   In the mid-1990s, when the Iran/Hezbollah/al Qaeda terror alliance was forming, al Qaeda operative Mustafa Hamid had "negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan." This safe Iran-Afghanistan passageway was managed by Defendant MOIS.

(110)   In 2000, Iran facilitated the international travel of al Qaeda's operatives between October 2000 and February 2001, including travel of at least eight of the 9/11 hijackers from Iran into Afghanistan, where bin Laden's training camps were located, and where the 9/11 hijackers trained for the 9/11 operation. Iran thus provided essential material and direct support of the 9/11 attacks.

(111)   The Iranian government materially and directly supported the 9/11 terrorist travel operation by ordering its border inspector not to place telltale Iranian stamps in the passports of these future hijackers traveling to and from Afghanistan via Iran. Eight to fourteen of the 9/11 hijackers transited Iran on their way to or from Afghanistan, and Iranian border inspectors did not stamp their Saudi passports. The Iranians were aware they were helping operatives who were part of an organization preparing attacks against the United States. The action of Iranian border authorities in refraining from stamping the passports of the Saudi hijackers vastly increased the likelihood of the operation success of the 9/11 plot.

(112) Mughniyah also helped to coordinate other travel by the 9/11 hijackers. In October 2000, Mughniyah visited Saudi Arabia to coordinate future 9/11 hijacker activities there and assisted them in traveling on to Iran during November 2000. During this time period, on their travels in and out of Iran, and through Lebanon, some of the 9/11 hijackers were accompanied by Mughniyah or his Hezbollah associate.

(113) The actions of Mughniyah, and his Hezbollah associates, in escorting 9/11 hijackers on flights to and from Iran, and coordinating passport and visa acquisition activities in Saudi Arabia, constituted direct and material support for the 9/11 conspiracy.

## THE KINGDOM OF SAUDI ARABIA'S LIABILITY FOR THE SEPTEMBER 11TH ATTACKS

### Material Support for Al Qaeda and the 9/11 Attacks from Saudi Arabia's Proselytizing Agents and Alter Egos

(114) The emergence of al Qaeda under the patronage of the Saudi government's proselytizing apparatus is rooted in the unique relationship between the House of Saud and Wahhabi Islam.

(115) The modern Saudi state is a product of a pact forged in the 18th century between Muhammed Ibn al Saud, the head of the al Saud tribe in Arabia, and Muhammad Ibn Abd al Wahhab, a Muslim scholar from the Najd region of Arabia.

(116) Ibd Abd al Wahhab's ideas and teachings form the basis of the Islamic school of thought commonly known as Wahhabism, which forms the ideological foundation for the al Qaeda movement. According to the 9/11 Commission Report, al Qaeda finds inspiration and religious justification for its actions in a "long tradition of extreme intolerance" that flows "through the founders of Wahhabism." *See* 9/11 Commission Report at 362.

(117)   Pursuant to the compact between the House of Saud and the Saudi Ulema (Wahhabi scholars and clerics), the Ulema provides religious legitimacy for the House of Saud's political rule. In exchange, the House of Saud provides the Ulema with government platforms and resources to promote their Wahhabi religious agenda.

(118)   One of the most absolute conditions of this arrangement is the requirement that the Saudi state propagate Wahhabi Islam globally. *See* 9/11 Commission Report at 372.

(119)   To comply with this obligation, the Kingdom established several state da'awa organizations to serve as instruments for conducting proselytizing activities and otherwise advancing the Wahhabi agenda of the Saudi Ulema globally, including the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Rabita Trust, World Assembly of Muslim Youth ("WAMY"), Benevolent International Foundation ("BIF"), al Haramain Islamic Foundation ("AHIF"), Saudi High Commission for Relief of Bosnia and Herzegovina ("SHC"), Saudi Joint Relief Committee for Kosovo and Albania ("SJRC"), and Saudi Red Cross ("SRC"), and Al Haramain al Masjed al Aqsa.

(120)   From the formation of al Qaeda in 1988 through September 11, 2001, those Wahhabi proselytizing organizations established, funded, directed, and controlled by the Saudi government, and supervised by the Kingdom's Ministry of Islamic Affairs and embassies and consulates outside of Saudi Arabia, were responsible for providing the massive funding and other forms of support that allowed Osama bin Laden and al Qaeda to acquire the global strike capabilities employed by al Qaeda on September 11, 2001, and were at all times components of the Saudi government itself.

(121)   Osama bin Laden's collaboration with the Saudi state da'awa organizations began during the jihad against the Soviet Union in Afghanistan, when several of those organizations formed

the nucleus of a support network to provide funds, arms, and other assistance to the mujahideen, at the direction of the Saudi government and working in close coordination with bin Laden.

(122)   When Osama bin Laden formed al Qaeda to conduct jihad against the United States, the support network established by the da'awa organizations during the Afghan campaign was adapted to support bin Laden's targeting of the United States.

(123)   Indeed, internal al Qaeda documents detailing the formation of bin Laden's terror organization, seized by the U.S. during a 2002 raid of an al Qaeda front charity, indicated that Dr. Abdullah Omar Naseef, the then-head of MWL and a member of the Kingdom's Majlis al Shura (government consultative council), personally met with bin Laden and other founding members of al Qaeda at the time of al Qaeda's formation, and agreed that MWL offices would be used as a platform for the new jihad organization, and that attacks would be launched from MWL's offices.

(124)   Contemporaneous with this agreement, Saudi officials installed founding al Qaeda members in leadership posts of the Saudi da'awa organizations, in locations of strategic importance to al Qaeda.

(125)   For example, Naseef appointed Wael Jelaidan, a founding member of al Qaeda whom the United States designated as a terrorist after 9/11 for "directing organizations that have provided financial and logistical support to al Qaeda" to serve as the head of the Peshawar, Pakistan office of MWL in 1989.

(126)   Naseef also appointed Mohammed Khalifa, another founding al Qaeda member and Osama bin Laden's brother in law, to serve as the director of a new IIRO office the Far East in this time period, another location of strategic importance to the new al Qaeda organization for recruitment and other reasons.

(127)   Shortly after assuming this post, Khalifa used IIRO funds and resources to support a terrorist cell in the Philippines, which included 9/11 masterminds Khalid Sheikh Mohammed and Ramzi Yousef, in relation to the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations or twelve U.S. flag commercial airplanes. That very plot, often referred to as "Operation Bojinka", was adapted by Khalid Sheikh Mohammed, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system, into the September 11th plot.

(128)   The internal documents relating to al Qaeda's establishment and other evidence indicate that founding al Qaeda members held senior posts in WAMY/BIF (Adel Batterjee), SRC (Wael Jelaidan), and AHIF (Aqeel al Aqeel) during the period surrounding al Qaeda's formation.

(129)   In the years surrounding al Qaeda's formation with the direct assistance of the Saudi officials who directed the Kingdom's da'awa organizations, support flowed continuously from the Kingdom's da'awa organizations to al Qaeda, providing the massive funding and other essential resources that enabled bin Laden to build and maintain al Qaeda.

(130)   As the 9/11 Commission's Staff Monograph on terrorist financing explained, "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities."

(131)   State Department cables, U.S. intelligence and counter-terrorism reports, declarations of U.S. officials, foreign intelligence reports, and other evidence confirm that the "Islamic charities" most responsible for channeling this essential support to al Qaeda were MWL, IIRO, WAMY, AHIF, Rabita Trust, SHC, SJRC, SRC, BIF, and Al Haramain al Masjed al Aqsa.

(132)   The tortious acts of those da'awa organizations in support of al Qaeda included:

        a)        Raising and laundering funds on behalf of al Qaeda and its affiliates;

b)      Channeling funds to al Qaeda;

c)      Providing financial and logistical support and physical assets to al Qaeda members;

d)      Directly participating in al Qaeda's terrorist activities, including the planning, coordination, funding, and execution of terrorist attacks;

e)      Permitting al Qaeda members to use ostensible employment with their organizations as a cover for their travels and terrorist activities;

f)      Serving as liaisons to localized terrorist organizations on behalf of al Qaeda, thereby assisting al Qaeda in expanding its operational base and sphere of influence;

g)      Funding and facilitating shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda;

h)      Funding camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists, including camps used to train the September 11th hijackers;

i)      Actively recruiting new members for al Qaeda;

j)      Working throughout the world to spread al Qaeda's jihadist ideology and draw new adherents to its cause;

k)      Serving as channels for distributing information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media;

l)      Disseminating publications designed to advance al Qaeda's Wahhabi Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds they are "infidels" who do not deserve to live"; and

m)      Openly advocating for young Muslims to take up arms against Western and democratic societies, including the United States.

(133)   The intimate collaborations between the Saudi government da'awa organizations and al Qaeda are further reflected by actions, statements, and reports by the U.S. government pertaining to each in the years immediately before and after the September 11th Attacks.

(134)   For instance, following the September 11th Attacks, the United States designated the

entire AHIF organization and its senior leadership pursuant to Executive Order 13224 Specially

Designated Global Terrorist program, explaining that AHIF was one of the principal

organizations "providing support for the al Qaeda network and promoting militant Islamic

doctrine worldwide."

(135)   The United States also designated Rabita Trust on October 12, 2001, "for its close ties to

senior al Qaeda leadership and for providing logistical and financial support to al Qaeda." As

reflected in this designation, Rabita Trust's director during the period immediately before and

through the September 11th Attacks was al Qaeda founding member Wael Jelaidan who was

again serving in a position of authority in a Saudi government da'awa organization by

appointment of the Saudi government.

(136)   The U.S. designated several offices of the IIRO as well, along with a senior IIRO official

in Saudi Arabia (who in that capacity was an employee of the Saudi government), describing him

as the "'million dollar man' for supporting Islamic extremists".

(137)   State Department cables further identify IIRO as the principal sponsor of terrorist training

camps in Afghanistan during the Taliban regime and indicate that Osama bin Laden used the

entire IIRO network for his terrorist activities.

(138)   State Department cables similarly reveal that the U.S. Embassy in Sarajevo

recommended that the SHC be designated pursuant to Executive Order 13224 based on its

activities in support of al Qaeda, and that U.S. counter-terrorism officials included the SHC in a

group of terrorist fronts they referred to as "the dirty dozen".

(139)   U.S. Defense Department records likewise confirm the United States' determination that

"WAMY is a Tier One Counterterrorism NGO target, defined as those that have demonstrated

sustained and active support for terrorist organizations willing to attack U.S. persons or interests."

(140)   In a confidential communication to UN peacekeeping forces, the United States identified SJRC as an organization that "move[s] money and men" for Osama bin Laden, and noted that SJRC's director, Wael Jelaidan, (once again, by appointment of the Saudi government) was an associate of Osama bin Laden.

(141)   The material support provided by the Saudi da'awa organizations included aid and operational assistance closely related to al Qaeda's efforts to target the United States through large-scale terrorist attacks, including the September 11th Attacks.

(142)   For example, U.S. government reports indicate that IIRO and AHIF funded the terrorist camps where the 9/11 hijackers received their training.

(143)   Sayed Abu Naser, an IIRO official interrogated by Indian officials in relation to a 1999 al Qaeda plot to attack the U.S. diplomatic missions in Calcutta and Madras, confirmed this funding program, telling his interrogators that he personally visited al Qaeda camps in Afghanistan on behalf of IIRO, to assess their funding needs. Naser estimated that as much as 50-60% of IIRO funds were channeled to terrorist training camps in Afghanistan and Kashmir.

(144)   The findings of a partial audit conducted by a Pakistani affiliate of Ernst & Young of funds distributed by IIRO's Saudi headquarters through its office in Pakistan align with this estimate.

(145)   Completed just months before the September 11th Attacks, and covering the period between January 1996 and February 2001, the partial audit found that over half of the funds distributed through the office – totaling millions of dollars – could not be accounted for, and that

senior officials of IIRO had engaged in the wholesale fabrication of invoices, receipts, and entire construction projects to conceal the illicit use of funds.

(146)   According to Jamal al Fadl, a former al Qaeda official who became a cooperating witness for the United States and testified at length in the African embassy bombing trials, IIRO officials had been using fraudulent orphan distribution lists to conceal the funding of al Qaeda since at least the early 1990s.

(147)   U.S. and foreign investigations also document the direct involvement of both IIRO and AHIF in the planning, coordination, and execution of the 1998 U.S. Embassy bombings in Kenya and Tanzania, as well as IIRO's role in the aviation-related terrorist plot that was adapted and became the September 11th plot.

(148)   In addition, the director of AHIF's office in Belgium, Tarek Maaroufi, was arrested in late 2001 by Belgian authorities and thereafter convicted for involvement in the assassination of anti-Taliban Northern Alliance commander Ahmed Shah Massoud.

(149)   The assassination was a component of the 9/11 plot itself: Massoud was killed in Afghanistan just two days before the September 11th Attacks, as part of al Qaeda's efforts to limit the operational capabilities of the Northern Alliance to mount an offensive against al Qaeda in response to the attacks. Maaroufi, who was hired by AHIF following his release from prison for involvement in the terrorist attack in Belgium, recruited the assassins and provided them with fake passports for the operation.

(150)   A post-9/11 counter-terrorism raid of the Sarajevo office of the SHC uncovered a range of materials confirming the SHC's direct involvement in the portfolio of plots al Qaeda was developing during that time period to attack the American homeland (of which the September 11th Attacks were a component), including photographs of the World Trade Center before and

after its collapse; photographs of the U.S. Embassies in Kenya and Tanzania, and the U.S.S. Cole; files on deploying chemical agents with crop dusters; information about how to make fake State Department badges, and photographs and maps of Washington marking prominent government buildings.

(151)   The subject matter of those materials recovered in the raid of SHC's offices shortly after the September 11th Attacks mirrors several of the plots Zacarias Moussaoui, an al Qaeda associate who was meant to be the "20th hijacker" but was detained by immigration officials beforehand, testified that he was sent to the United States by al Qaeda to explore.

(152)   Separately, convicted al Qaeda member and SHC employee Ali Ahmed al Hamad affirmed in his testimony that al Qaeda members were broadly embedded in SHC offices, and were using SHC facilities to plot attacks against the West.

(153)   The SHC's material sponsorship of al Qaeda also encompassed arms trafficking on behalf of Osama bin Laden's organization, and the laundering of millions of dollars for al Qaeda's benefit, as reflected by United Nations and Bosnian investigations. SHC's fundraising activities in support of al Qaeda included money laundering operations carried out in collaboration with Wael Jelaidan, Yassin Kadi and Chafiq Ayadi, all of whom were designated by the United States after the September 11th Attacks pursuant to Executive Order 13224.

(154)   More broadly, statements of U.S. officials and government reports demonstrate how the expansive support provided by the Saudi government da'awa organizations enabled bin Laden to build and sustain the al Qaeda organization and acquire the resources and assets necessary to carry out the September 11th Attacks.

(155)   In this regard, the 9/11 Commission Report expressly found that the "9/11 attack was a complex international operation, the product of years of planning."

(156)   The 9/11 Commission Report further confirms that plans for the attacks were carefully

vetted through al Qaeda's most senior leadership over a period of nearly six years, while those

leaders were safely ensconced in training camps and safe houses funded by al Qaeda's financial

supporters; that the individuals selected to participate in the attacks were chosen from an

enormous pool of potential candidates, all of whom were recruited, trained, and indoctrinated

with funds provided by the organization's supporters; and that details of the plans were revised

up until the very last minute, through a sophisticated global communication network capable of

evading the surveillance and intelligence operations of the United States and its allies, the

development and existence of which was also dependent on the financial sponsorship of al

Qaeda's supporters.

(157)   The cost of maintaining this essential infrastructure in the years immediately leading up

to the September 11th Attacks was massive: al Qaeda's budget included $20 million in payments

to the Taliban alone, in exchange for the safe haven the Taliban provided to al Qaeda, from

which al Qaeda planned, coordinated, and directed the September 11th Attacks.

(158)   Based on these and other findings of its investigation concerning the relationship between

al Qaeda's global infrastructure and the organization's operational capability to plan, coordinate,

and mount the September 11th Attacks, the 9/11 Commission Report reached the following

conclusions regarding the basic organizational requirements for staging a sophisticated terrorist

attack:

> A complex international terrorist operation aimed at launching a catastrophic attack
> cannot be mounted by just anyone in any place. Such operations appear to require
>
> - Time, space, and ability to perform competent planning and staff work;
>
> - A command structure able to make necessary decisions and possessing the
>   authority and contacts to assemble needed people, money, and materials;

- Opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;

- A logistics network able to securely manage the travel of operatives, move money, and transport resources where they need to go;

- Access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological or biological attack;

- Reliable communications between coordinators and operatives; and

- Opportunity to test the workability of the plan.

*See* 9/11 Commission Report at 365-66.

(159)   U.S. counter-terrorism officials have expressed complete agreement with these empirical conclusions, affirming consistently and repeatedly the critical importance of al Qaeda's broader infrastructure and resources to its capacity to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks, including the September 11th Attacks themselves.

(160)   Plaintiffs' facts and evidence establish that the Saudi government da'awa organizations were principal providers of the funds and other resources used to build and sustain that infrastructure and acquire the organizational assets al Qaeda required to plan and carry out the attacks, thus drawing a direct and clear causal nexus between their contributions of support and the attacks.

### The Tortious Acts of the Kingdom's Da'awa Organizations in Support of al Qaeda are Attributable to Saudi Arabia

(161)   The tortious acts of the Saudi da'awa organizations in support of al Qaeda are attributable to the Kingdom on three separate grounds: (1) the da'awa organizations perform core functions of the Saudi state; (2) the da'awa organizations are agents of the Kingdom; and (3) the Saudi government dominates and controls the da'awa organizations, make them alter-egos of the Saudi government as well.

(162)   Saudi Arabia's Basic Law of Governance expressly provides that "[t]he State shall…undertake its duty regarding the propagation of Islam," thus confirming that the propagation of Wahhabi Islam globally is both a core function and duty of the Saudi government.

(163)   Indeed, in a speech on the issuance of the Basic Law of Governance in 1992, then-King Fahd bin Abdulaziz identified the nine bases for the foundation of the modern Saudi state, including "the undertaking of the Propagation of Islam and its dissemination, since the Propagation of Islam is one of the most important functions of an Islamic State."

(164)   During the period from al Qaeda's formation through the September 11th Attacks, MWL, IIRO, WAMY, BIF, AHIF, SHC, SRC, SJRC, Al Haramain al Masjed al Aqsa, and Rabita Trust served as the primary agents through which the Saudi government fulfilled this core function and duty to proselytize Wahhabi Islam globally.

(165)   The da'awa organizations are agents of the Saudi government, engaged in the performance of core functions and duties of the Kingdom.

(166)   The Kingdom's proselytizing apparatus is comprised of three principal components: the Supreme Council for Islamic Affairs; the Ministry of Islamic Affairs,; and the individual da'awa organizations themselves (MWL, IIRO, WAMY, AHIF, SHC, SRC, SJRC, Al Haramain al Masjed al Aqsa, and Rabita Trust).

(167)   The Supreme Council for Islamic Affairs is the planning body, responsible for the Kingdom's Islamic work abroad, a function that includes coordinating "Saudi activities undertaken by the Islamic da'awa organizations."

(168)   The Ministry of Islamic Affairs is, in turn, an operational body that implements the Supreme Council's decisions, including through its funding, supervision, and direction of the individual da'awa organizations.

(169)   The da'awa organizations undertake their proselytizing work pursuant to the policies

established by the Saudi government, with funding provided by the government, under the

supervision of the Ministry of Islamic Affairs and local embassies and consulates, subject to the

approvals of the Saudi government.

(170)   The Kingdom regularly cites the activities of the da'awa organizations as achievements

of the state itself, and employees of those organizations have in various settings confirmed that

their activities are supervised by the Saudi government, undertaken pursuant to policies set by

the Kingdom, and overwhelmingly funded by the Saudi government.

(171)   For example, one senior AHIF official has stated that AHIF works under the supervision

of the Saudi government and that 95% of AHIF's funding comes from Saudi Arabia.

(172)   Arafat el Asahi, the director of IIRO in Canada and a full-time employee of the MWL,

testified as follows during a Canadian court proceeding:

> Let me tell you one thing, the Muslim World League, which is the mother of
> IIRO, is a fully government funded organization. In other words, I work for the
> government of Saudi Arabia. I am an employee of that government. Second, the
> IIRO is the relief branch of that organization which means that we are controlled
> in all of our activities and plans by the government of Saudi Arabia. Keep that in
> mind, please…I am paid by my organization which is funded by the [Saudi]
> government…the [IIRO] office, like any other office in the world, here or in the
> Muslim World League, has to abide by the policy of the Government of Saudi
> Arabia. If anybody deviates from that, he would be fired; he would not work at all
> with IIRO or with the Muslim World League.

(173)   Consistent with Asahi's testimony, MWL Secretary General Abdullah Mohsen al Turki

confirmed in November of 2000 that the Saudi government provides "over 90%" of MWL's

budget.

(174)   Dr. Mutlib bin Abdullah Al Nafissa, Minister of State of the Council of Ministers of

Saudi Arabia, has testified that the SHC "is an arm of the Saudi Arabian government. Actions

taken by the SHC properly are viewed as actions of the Government of Saudi Arabia." SHC

official Saud bin Mohammed Al Roshood has separately attested that "[t]he largest source of funding for the Saudi High Commission is the treasury of the Kingdom of Saudi Arabia."

(175)   Mutaz Saleh Abu Unuq, Financial Director of WAMY, has similarly confirmed that "WAMY is governed principally by its General Assembly and President who was appointed by the Saudi government. The current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia." Officials of WAMY have also confirmed that WAMY is subordinate to the Ministry of Islamic Affairs and supervised by the Ministry of Islamic Affairs. Senior WAMY officials have also confirmed that WAMY's primary source of funding comes from the Saudi government's annual budget.

(176)   Abdulrahman al Swailem, President of SRC, testified that the Government of the Kingdom "sponsors and supervises the Saudi Arabian Red Crescent Society, and the Saudi government appoints all of its directors."

(177)   He also provided affidavit testimony that the SJRC was created in 1999 pursuant to a High Order issued by the King of Saudi Arabia upon the recommendation of the Council of Ministers of Saudi Arabia and has "always functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia."

(178)   These and other facts demonstrating that the da'awa organizations are the principal instruments through which the Saudi government fulfills its state duty to propagate Wahhabi Islam, are funded by the government and headed by government officials, and act in accordance with policies set by the government and under the supervision of the government, readily establish that they are agents of the Saudi government engaged in the performance of core functions and duties of the Kingdom.

(179)   The facts and evidence also demonstrate that the Saudi government rigidly controlled the operations of the da'awa organizations, a showing that both further conforms that they are agents of the Kingdom, and establishes that their conduct is attributable to the Kingdom on the separate legal basis that they also are controlled alter-egos of the Saudi government.

(180)   The Kingdom's complete domination of the da'awa organizations is manifested through a broad range of legal, financial, policy, supervisory, administrative, and operational controls, applied in substantially the same manner as to each of the entities, as evidenced by the following:

a)      The da'awa organizations are established by royal decree, issued by the King of Saudi Arabia and with the formal approval of high-ranking officials of the Saudi government.

b)      The da'awa organizations are funded almost entirely by the government of Saudi Arabia.

c)      Funds are allocated to the da'awa organizations via government grants authorized by the Special Committee of the Council of Ministers, which are paid from Saudi government bank accounts with government funds.

d)      The government of Saudi Arabia appoints the senior officials of the da'awa organizations.

e)      Leadership positions of the da'awa organizations are dominated by high-ranking officials of the Saudi government, who typically hold other senior posts in the Saudi government. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. Additionally, Saleh bin Abdul Aziz al Sheikh, while serving as the Minister of Islamic Affairs, also served as a chairman of WAMY and AHIF. The Secretary General of MWL holds a position equivalent to that of a "Minister" in the Saudi government. As the director of the SRC, Abdulrahman al Swailem held a position at an "Excellency level" per appointment by the Saudi King.

f)      The da'awa organizations report to senior Saudi officials, including in certain cases the King, concerning their operations and activities outside of Saudi Arabia.

g)      The da'awa organizations submit resolutions prepared by their governing bodies to the Saudi government's Council of Ministers for approval.

h)      The da'awa organizations operate under significant administrative guidance and regulation from senior members of the Saudi government. Indeed, the activities

and projects undertaken by the da'awa organizations, including the collection and transferring of funds, are approved at the highest levels of the Saudi government.

i)  The da'awa organizations seek approval from the Ministry of Islamic Affairs for the annual operating budgets of projects managed by the da'awa organizations.

j)  Policy making bodies of the Saudi government commonly direct the da'awa organizations concerning the projects and activities they are to conduct abroad, and determines which of the da'awa organizations will conduct those activities.

k)  The provision of aid by the da'awa organizations is subject to the approval of senior Saudi officials, including in certain instances the Saudi Foreign Minister and Ministry of Foreign Affairs.

l)  Senior officials of the Saudi government, including from within the Special Ministers Council, are embedded in the governing bodies of the da'awa organizations.

m)  The Supreme Council for Islamic Affairs issues guidelines concerning relief activities to be undertaken by the da'awa organizations outside of Saudi Arabia.

n)  The Ministry of Islamic Affairs has primary responsibility for supervising and directing the operations and activities of the da'awa organizations in the Kingdom and abroad. The Minister of Islamic Affairs appoints individuals to the organization's board of directors, committees, and senior management.

o)  The Minister of Islamic Affairs has confirmed that the da'awa organizations' activities are based on the institutional principles of the Kingdom, and that the Kingdom provides clear work plans which the da'awa organizations must follow.

p)  Meetings of senior leaders of the da'awa organizations are in certain cases conducted at the government offices of the Ministry of Islamic Affairs.

q)  The operations of the da'awa organizations' overseas branch officers are directed and closely supervised by the local Saudi embassies in the region, under the supervision of the embassy's Islamic Affairs Division.

r)  Operations of the da'awa organizations outside of Saudi Arabia are commonly carried out under the direction of a joint committee consisting of representatives of the da'awa organizations and Saudi embassy personnel.

s)  Saudi officials serving within the Islamic Affairs Departments of the Saudi embassies and consulates abroad simultaneously hold positions in the committees of the local branch offices of the da'awa organizations.

t)    Employees of the Ministry of Islamic Affairs have worked for the da'awa organizations, while being paid by the Ministry of Islamic Affairs.

u)    Internal correspondence of the da'awa organizations confirms that aid distributed by the da'awa organizations abroad is monitored by the Saudi embassies and the committees of the overseas offices, which include representatives of the embassies.

v)    The da'awa organizations have indicated that the operations abroad are undertaken on behalf of the Saudi government and local Saudi embassy in those countries.

w)    The Kingdom commonly requests that host countries grant the da'awa organizations diplomatic status, and issues diplomatic passports to employees of those offices.

x)    Employees of the da'awa organizations have confirmed that the organizations operate as government arms, and that they themselves are Saudi government employees in their roles working for the da'awa organizations.

y)    The branch offices of the da'awa organizations are subject to the direction of the local Saudi embassies on projects undertaken by those offices, as reflected by a 1996 directive from the IIRO's Director of the Overseas Offices Administration reminding "all managers of the IIRO overseas offices, its representatives and delegates" of "the duty to cooperate and coordinate with the brothers in charge in the host country," including the representative of the Ministry of Islamic Affairs office within the Saudi embassy and other government officials.

z)    Branch offices of the da'awa organizations have been opened under the auspices of the local representatives of the Ministry of Islamic Affairs, pending establishment of a local office.

aa)   Internal correspondence of the IIRO indicated that the opening of offices of the da'awa organizations is subject to the approval of the Ministry of Foreign Affairs.

bb)   Officials of the Saudi embassies abroad initiated the opening of offices of the da'awa organizations.

cc)   The da'awa organizations seek approval from the Ministry of Islamic Affairs to establish delegations to visit foreign countries.

dd)   The Saudi government often purchases or leases buildings to house the operations of the da'awa organizations, as for example was the case with MWL's headquarters in the Kingdom, which was donated by the King, and WAMY's office in Washington, D.C., the purchase of which was coordinated by the Under Secretary of the Ministry of Islamic Affairs, and handled by the local embassy.

ee)     Representatives of the Ministry of Islamic Affairs directly intervened in personnel decisions of the da'awa organizations at every level, such as the appointment of Abdullah bin Laden to serve as WAMY's representative in the United States.

ff)     Saudi diplomats have held signatory authority over bank accounts of the da'awa organizations.

gg)     The Saudi government has issued diplomatic license plates for vehicles of the da'awa organizations abroad.

hh)     Funds transferred from the organization's headquarters in Saudi Arabia to the overseas branch offices cannot be used for anything other than the objectives for which they are allocated.

ii)     The senior Saudi officials who head the da'awa organizations retain stringent administrative and financial control over the daily operations of the various branch offices and affiliates around the world.

jj)     The senior Saudi officials who head the da'awa organizations have the authority to appoint and terminate employees in the overseas branch offices.

kk)     Per the directives of the senior Saudi officials who head the da'awa organizations, the overseas branch offices are incapable of independent action. All significant administrative or financial decisions or undertakings by the overseas offices, even relatively minor decisions, are reviewed and approved at the highest levels of the organization inside the Kingdom, by the offices of the senior Saudi officials who head those organizations.

ll)     The overseas branch offices are required to submit quarterly and annual operations and financial reports to the senior Saudi officials who head the da'awa organizations.

mm)     The overseas branch offices are required to send copies of their monthly bank statements to the senior Saudi officials who head the da'awa organizations for review.

nn)     The overseas branch offices are required to send monthly expense reports to the senior Saudi officials who head the da'awa organizations.

oo)     Requests for financial aid submitted to the overseas branch offices must be sent to the senior Saudi officials who head the da'awa organizations for review.

pp)     The overseas branch offices are forbidden from opening any bank account, or withdrawing any office funds or capital, without prior written consent of the senior Saudi officials who head the da'awa organizations.

qq)  The overseas branch offices are forbidden from spending their own independently raised donations on projects or other activities without authorization from the senior Saudi officials who head the da'awa organizations.

(181)  As reflected by the foregoing facts, the Saudi government thoroughly dominates the da'awa organizations and controls their day-to-day operations.

(182)  The tortious acts of the da'awa organizations in support of al Qaeda were, in turn, undertaken in furtherance of their core mission to spread Wahhabi doctrine and practice, and therefore within the scope of their agency as the Saudi government's principal instruments for spreading Wahhabism globally.

**Tortious Acts of Saudi Government Officials and Employees Who Directed and Controlled the Kingdom's Da'awa Organizations**

(183)  The Saudi government's proselytizing organizations extensively aided and abetted al Qaeda's targeting of the United States, and provided funding and other assistance closely related and essential to the September 11th Attacks.

(184)  Apart from the fact that the tortious acts of those organizations are attributable to the Saudi state, the tortious acts of the Saudi officials who directed those organizations' support of al Qaeda, many of whom held broader roles in the Saudi government beyond their positions with the da'awa organizations, also are attributable to the Kingdom for purposes of both jurisdiction and liability.

(185)  The facts and evidence documenting the terrorist activities of these so-called charities reflect broad institutional partnerships between those organizations and al Qaeda, confirming the involvement of those government officials in directing and facilitating their support for al Qaeda, as indicated by:

a)  The direct involvement of government officials who headed the da'awa organizations in the formation of al Qaeda;

45

b)      The sheer magnitude of the financial and other forms of material support they provided to bin Laden's organization;

c)      The systemic placement of al Qaeda members and collaborators in positions of authority within the da'awa organizations;

d)      The intimacy of their collaboration in al Qaeda's operations, as documented in government investigations;

e)      The evidence showing that offices of the charities throughout the world were simultaneously all acting in identical ways to advance al Qaeda's terrorist agenda;

f)      The duration of their support for al Qaeda, spanning in most cases more than a decade;

g)      The fact that their support for al Qaeda continued without interruption even after offices and employees of those organizations were repeatedly and publicly implicated in terrorist activities; and

h)      Their ideological alignment with al Qaeda's jihadist agenda, as reflected in their own publications, statements, and speeches.

(186)   As also detailed above, the individuals who headed these proselytizing organizations throughout the duration of their institutional partnerships with al Qaeda were Saudi government officials and employees.

(187)   Individuals who controlled and worked in the branch offices of those organizations that were directly involved in al Qaeda's operations were Saudi government employees as well, as reflected by the issuance of diplomatic passports to employees of those offices, the appointment of embassy personnel from the Ministry of Islamic Affairs to the operating committees and leadership positions of those offices, and the statements of numerous employees of those da'awa organizations describing themselves as employees of the Saudi government.

(188)   The material sponsorship of al Qaeda by these da'awa organizations under the direction of these Saudi government officials and employees was in furtherance of their core mission to spread Wahhabism throughout the world, and the tortious acts of the government officials who

directed and participated in those organizations' support for al Qaeda thus fall squarely within the scope of their office and employment.

### Tortious Acts of the Ministry of Islamic Affairs and Employees and Officials of the Ministry of Islamic Affairs

(189)   Saudi Arabia's Ministry of Islamic Affairs was broadly involved in the promotion of al Qaeda's terrorist activities during the period leading up to the September 11th Attacks.

(190)   The Ministry of Islamic Affairs has been described as a "stronghold of zealots" during the period before September 11, 2001, and 9/11 Commissioner John Lehman has testified that it was "well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists."

(191)   The Ministry of Islamic Affairs assumed control over the Kingdom's global da'awa apparatus following the Ministry's formation in 1993.

(192)   In the ensuing years, and under the direction and supervision of the Ministry of Islamic Affairs, the Kingdom's da'awa organizations pervasively channeled resources provided to them by the Ministry to al Qaeda, and collaborated intimately with bin Laden's terrorist organization.

(193)   Employees of the Ministry also used additional resources and institutions under their control to launder funds for al Qaeda, including from within the United States.

(194)   For example, in or around 1998, the FBI become aware of millions of dollars of transfers from the Somali community in San Diego to fronts associated with Osama bin Laden. The FBI's further investigations indicated that "some of the funding originated from Saudi Arabia" and that the funds were laundered through mosques and Islamic centers under the control and influence of the Ministry of Islamic Affairs.

(195)   Representatives of the Islamic Affairs offices of the Kingdom's embassies and consulates also provided large cash transfers to al Qaeda. In this regard, U.S. Defense intelligence investigations determined that Saudi embassies in the Far East were providing large sums of cash, including individual transfers totaling several hundred thousand dollars, to the al Qaeda affiliated Umm al-Qura Islamic Foundation, an organization whose "activities in support of terrorism include suspicious money transfers, document forgery, providing jobs to wanted terrorist suspects, and financing travel for youths to attend jihad training."

(196)   In addition, documents recovered from the personal files of Taliban leaders Mullah Mohammed Omar following the September 11th Attacks indicate that on November 21, 1999, Omar instructed the Afghan Ambassador in Pakistan to distribute "$2 million from Saudi aids" to Jon Juma Namangani, a close associate of Osama bin Laden who was then serving as al Qaeda's commander in Uzbekistan.

(197)   The Ministry of Islamic Affairs' broad collaboration with al Qaeda before 9/11 is further reflected by the evidence implicating at least seven employees and agents of the Ministry of Islamic Affairs in providing support to the 9/11 hijackers and plotters, and the fact that employees of the Ministry had been implicated in separate terrorist activities in the Netherlands, Germany, Paris, Brussels, and elsewhere.

(198)   In addition, Zacarias Moussaoui has testified that bin Laden maintained strong relationships with the clerics who controlled the Ministry of Islamic Affairs and related components of the Kingdom's government proselytizing and Wahhabi religious apparatus. Based on his personal knowledge, Moussaoui stated that bin Laden's attitude toward the Saudi Ulema "was of complete reverence and obedience"; bin Laden's activities were conducted with the "consent and directive of the Ulema"; bin Laden would not undertake any operations without the

Ulema's approval; and representatives of the senior Ulema regularly traveled to Afghanistan to visit with bin Laden.

(199)   Saudi government imams were deeply involved in recruitment and fundraising for al Qaeda, as reflected in records from the detainee tribunal proceedings at Guantanamo Bay and prominent academic studies.

(200)   Indeed, Saudi government clerics recruited certain of the 9/11 hijackers, as confirmed by the 9/11 Commission's investigation.

(201)   In the wake of the September 11th Attacks, the United States took action to address the extremist activities of the Ministry of Islamic Affairs through its offices in the United States, removing between 60-70 individuals associated with the Ministry of Islamic Affairs and religious offices of the Kingdom's embassies and consulates in what a State Department official described as part of "an ongoing effort to protect the homeland."

(202)   In addition, following al Qaeda's 2003 attacks in Saudi Arabia, the Kingdom itself removed thousands of clerics from the payroll of the Ministry, and has characterized those removals as part of a counter-terrorism effort, thus drawing a direct connection between the Ministry and terrorism in earlier periods.

(203)   The nature and extent of the Ministry of Islamic Affairs' support for al Qaeda and other terrorists demonstrate that collaborating with jihadists was within the scope of the activities of the Ministry and its employees, in furtherance of the Ministry's efforts to propagate Wahhabism.

### Attributable Tortious Acts of Individual Employees and Agents of the Saudi Government in Support of the 9/11 Hijackers and Plotters

(204)   On July 15, 2016, the United States released a partially declassified version of Part Four of the 2002 Report of the Congressional Joint Inquiry into the Terrorist Attacks of September 11, 2001, commonly referred to as the so-called "28 pages." Thereafter, in December 2016, the FBI

and DOJ released the Summary Report, originally prepared in 2012, describing the status and

principal findings of ongoing investigations into sources of support for the 9/11 hijackers. These

documents offer additional facts and evidence in support of Plaintiffs' claims that employees and

agents of the Saudi government, while engaged in performing functions on behalf of the Ministry

of Islamic Affairs and Saudi proselytizing apparatus, directly aided and assisted the 9/11

hijackers and plotters.

(205)   The Saudi government maintained a network of agents in the United States in the years

preceding the September 11th Attacks, whose undisclosed functions involved performing

activities on behalf of and at the direction of the Wahhabi clerics who populated the Islamic

Affairs Offices of the Kingdom's embassies and consulates in the United States.

(206)   Members of that network maintained extensive contacts and supportive dealings with

members of al Qaeda and related terrorist organizations.

(207)   Saudi government employees and agents who were members of that network directly

aided the 9/11 hijackers at the direction of more senior Saudi officials.

(208)   The FBI has confirmed that Saudi government employees Omar al Bayoumi and Fahad al

Thumairy provided "substantial assistance" to 9/11 hijackers Nawaf al Hazmi and Khalid al

Mihdhar when they arrived in the United States in January 2000, up until the September 11th

Attacks.

(209)   Thumairy and Bayoumi substantially assisted the 9/11 hijackers by, among other things,

providing, or directing others to provide, assistance in daily activities, including procuring living

quarters, financial assistance, and assistance in obtaining flight lessons and drivers' licenses.

(210)   Thumairy, an extremist Wahhabi cleric who held diplomatic credentials with the Saudi consulate in Los Angeles, was responsible for immediately assigning someone to take care of Hazmi and Mihdhar upon their arrival in the United States.

(211)   Thumairy was denied re-entry into the United States by the State Department in 2003 based on his ties to terrorism.

(212)   Bayoumi, one of the Kingdom's employees and agents in the United States performing undisclosed functions on behalf of the Kingdom's embassies and consulates and reporting to Thumairy, simultaneously maintained extensive ties to terrorists and to Islamic Affairs representatives employed in the Kingdom's embassies and consulates in the United States and elsewhere.

(213)   Bayoumi proffered a letter from the Saudi embassy representing that he would be studying in the United States pursuant to "a full scholarship from the Saudi government" but in fact was living in San Diego on a student visa, despite not taking classes and receiving a salary from the Kingdom for a job he never performed.

(214)   Another member of the Kingdom's network of agents in the United States, Mohammad al Qudhaeein, participated along with an al Qaeda operative named Hamdan al Shalawi, in a dry run for the 9/11 attacks. The dry run occurred on a flight from Phoenix to Washington, D.C., in November 1999.

(215)   During that flight, al Qudhaeein "went to the front of the plane and attempted on two occasions to enter the cockpit," and the FBI "believes both men [whose airline tickets were paid for by the Saudi Embassy] were specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of" operations being planned by al Qaeda and bin Laden.

(216)   The Congressional Joint Inquiry documented numerous other contacts, dealings, and transactions between individuals employed or associated with the Saudi government and known terrorists and extremists, reflecting a broad presence of al Qaeda supporters within Saudi government institutions in the years leading up to 9/11.

(217)   The former head of Alec Station, the CIA's unit established in 1996 to focus exclusively on bin Laden, told U.S. investigators that "it was clear from about 1996 that the Saudi Government would not cooperate with the United States on matters relating to Osama bin Laden," explaining that "Saudi assistance to the U.S. government on this matter was contrary to Saudi national interests."

### 9/11 Hijackers Nawaf al Hazmi and Khalid al Mihdhar

(218)   Al Qaeda members and future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar arrived in Los Angeles on January 15, 2000, to commence critical U.S.-based preparations for the September 11th Attacks.

(219)   As the 9/11 Commission confirmed in its Final Report, Hazmi and Mihdhar were "ill prepared for a mission in the United States. Their only qualifications for this plot were their devotion to Osama bin Laden, their veteran service, and their ability to get valid U.S. visas. Neither had spent any substantial time in the West, and neither spoke much, if any, English." *See* 9/11 Commission Final Report at 215.

(220)   For those and other reasons, the 9/11 Commission correctly concluded that it was "unlikely that Hazmi and Mihdhar…would have come to the United States without arranging to receive assistance from one or more individuals in advance of their arrival." *See id.*

(221)   Consistent with the 9/11 Commission's conclusion on this point, the facts and evidence confirm that several individuals with extensive ties to terrorism immediately mobilized to

provide the precise forms of assistance Hazmi and Mihdhar most needed to assimilate into the United States without detection and initiate essential preparations for the attacks.

(222)   Those individuals were employees and agents of the Kingdom of Saudi Arabia, whose duties involved the performance of functions in furtherance of the extremist agenda of the Kingdom's Ministry of Islamic Affairs, including in particular Fahad al Thumairy, Omar al Bayoumi, and Osama Basnan.

**Substantial Assistance Provided by Thumairy, Bayoumi, and Basnan**

(223)   Witnesses interviewed by the FBI after 9/11 placed Hazmi and Mihdhar at the Saudi government-funded King Fahd Mosque near Los Angeles in the days immediately after their arrival in the United States. At the time, Thumairy was the resident imam at the mosque, by appointment of the Kingdom's Ministry of Islamic Affairs.

(224)   Thumairy was an extremist Wahhabi cleric employed by the Islamic Affairs Department of the Saudi consulate in Los Angeles, where he held diplomatic credentials, also by appointment of the Kingdom's Ministry of Islamic Affairs.

(225)   As reflected in the 9/11 Commission's Final Report, Thumairy led a particularly radical faction within the local Muslim community, including persons "supportive of the events of September 11, 2001," and "had a network of contacts in other cities in the United States." *See* 9/11 Commission Final Report at 216-17.

(226)   As also detailed in the 9/11 Commission Report, the U.S. State Department banned Thumairy from re-entering the United States in 2003, based on his apparent ties to terrorism. *See id.* at 217.

(227)   Thumairy was squarely at the center of orchestrating the U.S.-based support network for the hijackers upon their arrival in the United States, as reflected by the FBI's 2012 Summary

Report findings that "Thumairy immediately assigned an individual to take care of them [Hazmi and Mihdhar] during their time in the Los Angeles area." *See* Summary Report at 4; *see also* 9/11 Commission Final Report at 217 ("the circumstantial evidence makes Thumairy a logical person to consider as a possible point of contact for Hazmi and Mihdhar").

(228)   Just two weeks after the hijackers' arrival in the United States, Thumairy met for an hour in his office at the Saudi consulate with Bayoumi, a Saudi national who was residing in San Diego.

(229)   At the time, Bayoumi was one of several employees and agents of the Saudi government in the United States, whose undisclosed duties involved the advancement of the agenda of the Ministry of Islamic Affairs, under the direction of Thumairy and other more senior representatives of the Ministry's offices in the United States.

(230)   Immediately following that meeting, Bayoumi traveled to a restaurant located in the Los Angeles area, where he met with Hazmi and Mihdhar and promptly offered to assist the future hijackers settle in San Diego, the precise city al Qaeda leadership had identified as the preferred location for the hijackers to carry out their preparations for the attacks.

(231)   Following that meeting, Bayoumi did in fact provide critical assistance to the hijackers, including by helping them find an apartment in San Diego, co-signing the lease for that apartment as a guarantor, opening a bank account for the hijackers with $9000 from his own account, and paying their rent on occasion.

(232)   In addition, Bayoumi took steps to ensure that the hijackers received essential assistance from other members of the San Diego Muslim community who shared the hijackers' extremist views, including Anwar al Aulaqi and Mohdhar Abdullah.

(233)   In this regard, U.S. investigations have confirmed that Hazmi and Mihdhar arrived in San Diego on February 4, 2000, and that Bayoumi spent the day with the hijackers undertaking extraordinary efforts to facilitate their settlement in the area.

(234)   On that same day, four telephone calls were placed from Bayoumi's cell phone to Aulaqi, who would later flee the United State and assume a leadership position in al Qaeda, prompting the United States to target and kill him in a drone attack on September 30, 2011.

(235)   Investigators have determined that additional calls from Bayoumi's cell phone to Aulaqi were placed on February 10, 16, and 18, and that Bayoumi and Aulaqi were in telephone contact another five times between November 1998 and April 2000, and again on December 8, 2000.

(236)   In an interview with 9/11 Commission staff members, Bayoumi admitted to having a relationship with Aulaqi, describing him as someone "with whom he discussed religious matters and ideas similar to those he would discuss with other imams."

(237)   Aulaqi, who was covertly acting as a senior recruiter for al Qaeda and affiliated terrorist organizations and advocating jihad against the United States, had spent nearly five years as the imam of the al Rabat al Islami Mosque (or "Rabat") in La Mesa, California, northeast of San Diego. Aulaqi had a following of approximately 200-300 people and would become an important religious leader to Hazmi and Mihdhar.

(238)   FBI sources reported that "Aulaqi met consistently and privately with Hazmi and Mihdhar for prayers," and a witness interviewed by the FBI specifically recounted seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting. Other witnesses "informed the FBI after September 11 that [Aulaqi] had closed-door meetings in San Diego with Mihdhar, Hazmi, and another individual, whom Bayoumi had asked to help the hijackers."

(239)  Aulaqi eventually left San Diego in mid-2000 and by January 2001 had relocated to Virginia where he took a position at the Dar al Hijra Mosque in Falls Church, Virginia. The U.S. Treasury Department's Enforcement Communications System ("TECS") contains records stating that that Dar al Hijra "is a mosque operating as a front for Hamas operatives in the U.S.," "is associated with Islamic extremists," "has been under numerous investigations for financing and providing aid and comfort to bad orgs and members," and has "been linked to numerous individuals linked to terrorism funding."

(240)  Hazmi and 9/11 hijacker Hani Hanjour arrived in Virginia in April 2001 to begin critical last-phase preparations for the attacks, and immediately sought out Aulaqi at Dar al Hijra. Upon their arrival, Aulaqi tasked a Jordanian named Eyad al Rababah to help the hijackers get settled and find an apartment.  They eventually moved into Rababah's friend's apartment in Alexandria, Virginia. On May 8, 2001, Rababah went back to the apartment to pick up Hazmi and Hanjour for a flight to Connecticut, and found they had new roommates – muscle hijackers Ahmed al Ghamdi and Majed Moqed.

(241)  Following the September 11th Attacks, Aulaqi submitted to four FBI interviews between September 15 and 19, 2001. Although Aulaqi admitted meeting with Hazmi several times, he claimed not to remember any specific details of what they discussed. Aulaqi told the FBI that he did not recognize Mihdhar, but did admit to knowing fellow 9/11 hijacker Hani Hanjour. According to the FBI, information in their possession at the time of the interviews suggested "a more pervasive connection" between Aulaqi and the 9/11 hijackers than he was willing to admit.

(242)  These contacts and circumstances, coupled with Aulaqi's pervasive connections to terrorism, have led investigators, including 9/11 Congressional Joint Inquiry Co-Chair Senator Bob Graham, that Aulaqi served as Hazmi and Mihdhar's spiritual leader during the year

preceding the September 11th Attacks, and that he was a trusted confidant of the hijackers who was fully aware of the planned 9/11 attacks.

(243)   Bayoumi also introduced Hazmi and Mihdhar to Mohdhar Abdullah and directed Abdullah to assist the two hijackers.

(244)   Abdullah was a member of Aulaqi's mosque over whom both Bayoumi and Aulaqi exercised influence.

(245)   According to the 9/11 Commission, Abdullah was "perfectly suited to assist the hijackers in pursuing their mission" as he "clearly was sympathetic to [their] extremist views" and shared their "hatred for the U.S. government". *See* 9/11 Commission Final Report at 218.

(246)   In a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically tasked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, California," and that Bayoumi told him "to assist in any way in their affairs."

(247)   Per Bayoumi's instructions to provide unqualified assistance, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translation between English and Arabic. Abdullah also undertook extensive efforts to secure fake driver's licenses for Hazmi and Mihdhar, driving the hijackers from San Diego to an area in Los Angeles, where Abdullah purchased approximately four or five fraudulent California Department of Motor Vehicle identification cards and gave them to Hazmi and Mihdhar.

(248)   Abdullah also helped Hazmi conduct surveillance of the Los Angeles International Airport in June 2000. On June 9, Abdullah traveled with Hazmi and Mihdhar to Los Angeles where they visited the King Fahd Mosque, where Abdullah learned that the hijackers already knew several people at the mosque, including an individual identified as "Khallam."

(249)   FBI investigators believe the individual identified as "Khallam" is Khallad bin Attash, a trusted member of Osama bin Laden's inner al Qaeda leadership circle who is linked to the 1998 U.S. Embassy bombings in Kenya and Tanzania, and the purported mastermind behind the U.S.S. Cole bombing. CIA reports and other evidence indicate that bin Attash was in the United States that same month and was seen in the company of Fahad al Thumairy.

(250)   On June 10, 2000, Los Angeles International Airport security tapes show Abdullah, Hazmi, and an unidentified man (possibly Khallad) using a video camera to scout out the airport.

(251)   During a number of interviews with the FBI following the 9/11 attacks, Abdullah admitted knowing of Hazmi's and Mihdhar's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden, an extremist group in Yemen with ties to al Qaeda.

(252)   Just eight days after the September 11th Attacks, Abdullah "was arrested by FBI in San Diego on charges of immigration fraud for his claim of being a Somali asylee" and "pled guilty to the immigration charges and was deported to Yemen in 2004." *See* Summary Report at 3.

(253)   While "detained in an immigration facility he bragged to two fellow inmates that he assisted the hijackers." *See id*.

(254)   Consistent with this and other evidence, the 2012 Summary Report confirms that "shortly after February 4, 2000, Bayoumi tasked Mohdhar [Abdullah] to assist Hazmi and Mihdhar" and that "Mohdhar [Abdullah] played a key role facilitating the daily lives and assisting future Flight 77 hijackers Nawaf al Hazmi and Khalid al Mihdhar." *See* Summary Report at 3.

(255)   Another close associate of Bayoumi and fellow employee of the Saudi government, Osama Basnan, was in contact with and aided Hazmi and Mihdhar from within the United States as well, as reflected in evidence developed by the FBI and the Congressional Joint Inquiry.

(256)   Like Bayoumi, Basnan was another employee and agent of the Saudi government engaged in performing undisclosed functions for and at the direction of the extremists in the Ministry of Islamic Affairs' offices in the United States and elsewhere.

(257)   Witnesses interviewed by the FBI described Bayoumi and Basnan as "the closest of friends" and confirmed that the two were "close to each other for a long time." According to the FBI, Bayoumi and Basnan were in telephone contact "several times a day while they were both in San Diego" and "phone records reveal roughly 700 calls between various phones subscribed to by Bayoumi and Basnan over a one-year period."

(258)   FBI investigations have further confirmed that Basnan had extensive ties to terrorism and was an "ardent UBL [Osama bin Laden] supporter," who spoke of bin Laden "as if he were a god" and was "in contact with UBL family members." According to a federal law enforcement official, Basnan "celebrated the heroes of September 11" and talked about "what a wonderful, glorious day it had been" at a party shortly thereafter.

(259)   As detailed in the Congressional Joint Inquiry Report, "Basnan made a comment to an FBI source after the September 11 attacks suggesting that he did more for the hijackers than Bayoumi did." *See* CJI at 426.

(260)   Consistent with this claim, an October 3, 2001 FBI report indicates that Basnan also was in telephone contact with Aulaqi, and an FBI agent interviewed by the 9/11 Commission indicated that an associate of Basnan was in "phone and email contact with Ramzi Binalshibh in September 2000." At the time of those contacts, Binalshibh was a senior al Qaeda figure who was actively involved in planning and coordinating the September 11th Attacks.

(261)   The FBI's investigation has also documented contact between the hijackers and a close friend of Basnan's, Khaled al-Kayed, a commercial airline pilot and certified flight instructor

living in San Diego. Al-Kayed admitted to the FBI that in May 2000, Mihdhar and Hazmi

contacted him about learning to fly Boeing jet aircraft.

(262)   In addition, U.S. investigations have established that contemporaneous with the arrival of

Hazmi and Mihdhar in the United States, Basnan's wife began signing checks issued to her by a

charity associated with the wife of the Saudi Ambassador to the United States over to Bayoumi's

wife.

(263)   According to Senator Bob Graham, Co-Chair of the Congressional Joint Inquiry, these

transfers, which coincided with Bayoumi's provision of assistance to the hijackers, "looked

suspiciously like another backdoor way of channeling money to Hazmi and Mihdhar."

(264)   9/11 Commissioner John Lehman has, in turn, expressed his understanding based on the

investigation conducted by the 9/11 Commission that the charity that issued the payments to

Basnan's wife was under the control of "the radicals who worked in the embassy's Islamic

Affairs office in Washington."

(265)   During the course of their investigation, members of the 9/11 Commission staff

interviewed Thumairy, Bayoumi, and Basnan in Saudi Arabia. During those interviews, all three

lied pervasively about their relationships with one another and other material issues raised by the

Commission investigators.

(266)   According to the 9/11 Commission's Memorandum for the Record concerning its

interviews of Thumairy: "our general impression of Thumairy is that he was deceptive during

both interviews. His answers were either inconsistent or, at times, in direct conflict with

information we have from other sources. During some of the more pointed exchanges, his body

language suggested that he grew increasingly uncomfortable (for instance, he would cross his

arms, sit back in his chair, etc.)."

(267)   The memorandum recounting the 9/11 Commission's interview of Basnan similarly explains that "[it] failed to yield any new information of note. Instead, in the writer's opinion, it established beyond cavil the witness' utter lack of credibility on virtually every subject. This assessment is based on: the witness' demeanor, which engendered a combination of confrontation, evasiveness, and speechmaking, presumably for the benefit of his Mabahith [Saudi Intelligence] audience; his repudiation of statements made by him on prior occasions; and the inherent incredibility of many of his assertions when viewed in light of the totality of the available evidence."

(268)   Particularly when viewed collectively, these and Plaintiffs' additional facts and evidence relating to the relationships among Thumairy, Bayoumi, Abdullah, and Basnan; their respective ties to terrorism and extremist views; their concentrated dealings leading to the provision of the precise forms of assistance the hijackers most needed to assimilate into the United States and begin preparations for the attacks without detection; their deceitfulness to U.S. investigators; the findings and focus of the ongoing criminal investigations of Bayoumi and Thumairy; and the broader spectrum of evidence documenting the extensive involvement of elements of the Kingdom's Ministry of Islamic Affairs in supporting al Qaeda, readily establish: (1) that Thumairy, Bayoumi, and Basnan knew that Hazmi and Mihdhar were extremists who were engaged in efforts to target the United States; (2) that Thumairy, Bayoumi, and Basnan knew that they were substantially advancing that tortious endeavor through the assistance they were providing; and (3) that Thumairy, Bayoumi, and Basnan played witting roles in orchestrating and providing a critical support network for Hazmi and Mihdhar.

(269)   Congressional Joint Inquiry Co-Chair Senator Bob Graham has testified, based on his decades of experience in intelligence matters and personal knowledge of the evidence collected

by the Congressional Joint Inquiry, that "I am convinced that there was a direct line between at least some of the terrorist who carried out the September 11th Attacks and the government of Saudi Arabia," that "a Saudi government agent living in the United States, Omar al Bayoumi, provided direct assistance" to two of the hijackers, and that "Bayoumi was acting at the direction of elements of the Saudi government."

(270)   9/11 Commissioner John Lehman has likewise testified, based on his personal knowledge of the 9/11 Commission's separate investigation and his work for more than four decades in the national security arena, that "[b]y the time our Commission began its work, it was already well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists," and that "it is implausible to suggest that the broad spectrum of evidence developed by the 9/11 Commission concerning the relationships among Omar al Bayoumi, Fahad al Thumairy, the Islamic Affairs Departments of the Saudi diplomatic missions, and 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar can be explained away as merely coincidental. To the contrary, I believe Nawaf al Hazmi and Khalid al Mihdhar knew who to go to for support" and that "Fahad al Thumairy and Omar al Bayoumi knew that Mihdhar and Hazmi were bad actors who intended to do harm to the United States."

## Nature and Scope of Employment and Agency

(271)   At the time they were substantially assisting the 9/11 hijackers, Thumairy, Bayoumi, and Basnan were employees and agents of the Saudi government, and their activities in support of the hijackers were directly related to their core functions and duties involving the advancement of the Wahhabi agenda of the Kingdom's Ministry of Islamic Affairs.

(272)   As documented in the 9/11 Commission's Final Report, the FBI's 2012 Summary Report, and numerous other U.S. investigative records, Thumairy held diplomatic credentials with the

Saudi consulate in Los Angeles, where he served as an employee in the consulate's Islamic

Affairs office, and also served as an imam at the Saudi government-funded King Fahd Mosque.

(273)   Thumairy was appointed to both positions by the Kingdom's Ministry of Islamic Affairs.

(274)   The U.S. government's investigations also document Thumairy's extremist beliefs,

jihadist sermons, and terrorist connections, thus reinforcing both the radical character and agenda

of the Ministry of Islamic Affairs and of Thumairy's scope of work for the Ministry.

(275)   Bayoumi and Basnan were, in turn, employees and agents of the Saudi government

whose undisclosed duties involved the performance of activities on behalf of the Saudi

embassies and consulates in the United States, under the direction of the clerics embedded in the

Islamic Affairs offices and other officials of the Kingdom's embassies and consulates.

(276)   Nominally, Bayoumi entered the United States in or around 1994 on a student visa, and

thereafter proffered a letter from the Saudi embassy representing that he would be studying

pursuant to "a full scholarship from the Government of Saudi Arabia." *See* CJI at 423.

(277)   Bayoumi remained in the United States pursuant to student visas for nearly seven years,

until he departed the United States very shortly before the September 11th Attacks, despite never

pursuing any meaningful academic studies during that period. Saudi officials actively

perpetuated the false claim that Bayoumi was undertaking studies in the United States during that

seven year period.

(278)   Throughout that time, including the period when he was substantially assisting the

hijackers, Bayoumi received a salary from the Saudi government for alleged job duties he never

performed.

(279)   As the 2012 Summary Report succinctly confirms, at the time of Bayoumi's critical

meeting with Thumairy and assistance to the hijackers, "Omar al Bayoumi was living in San

Diego on a student visa, despite not attending classes, and receiving a salary from the Kingdom of Saudi Arabia for job duties he never performed." *See* Summary Report at 4.

(280)   These findings indicate that Bayoumi was an employee and agent of the Saudi government, stationed in the United States to perform undisclosed duties that the Kingdom sought to conceal.

(281)   The facts concerning Bayoumi's actual activities while he was in the United States, and receiving a salary from the Saudi government, demonstrate that his undisclosed functions for the Kingdom involved the performance of activities in furtherance of the agenda of the Ministry of Islamic Affairs, reporting to officials in the Kingdom's embassies and consulates, including Thumairy.

(282)   In this regard, Bayoumi had extensive and systematic dealings and communications throughout his residency in the United States with the Saudi embassies and consulates in the United States.

(283)   An FBI review of Bayoumi's telephone records confirmed that he called Saudi diplomatic missions in the United States at least 74 times during the period between January – March 2000 alone, coinciding with his assistance to the hijackers, including 34 calls to the Saudi consulate in Los Angeles where Thumairy worked.

(284)   In addition, U.S. investigations established that Bayoumi was directly connected to numerous employees and officials of Saudi Arabia's embassies and consulates and Ministry of Islamic Affairs, including the Minister of Islamic Affairs in Saudi Arabia; Thumairy; "an individual at the Saudi consulate in London[;]" and "at least three individuals at the Saudi Embassy in Washington, D.C.; two individuals at the Saudi Arabian Cultural Mission in

Washington, D.C.; and three individuals [likely including Thumairy] at the Saudi Consulate in Los Angeles."

(285)   Bayoumi also had pervasive contacts and dealings with Basnan, who was himself deeply intertwined with the Saudi government structure in the United States, and according to FBI reports may have succeeded Bayoumi in 2001.

(286)   This range of contacts with officials of the Saudi diplomatic missions and Ministry of Islamic Affairs, and pattern of communications with the Kingdom's consulates and embassies, reflect that Bayoumi was reporting to officials in the embassies and consulates, including representatives of the Islamic Affairs offices, in relation to his undisclosed work for the Saudi government.

(287)   Bayoumi's "seemingly endless" access to funds from Saudi Arabia, and use of those funds in support of causes within the core mission of the Ministry of Islamic Affairs, is further evidence that Bayoumi's functions for the government involved the performance of activities to advance the Ministry of Islamic Affairs' Wahhabi agenda.

(288)   For instance, as detailed in the Congressional Joint Inquiry Report, "Bayoumi was known to have access to large amounts of money from Saudi Arabia, despite the fact that he did not appear to hold a job. On one occasion prior to September 11, the FBI received information that Bayoumi had received $400,000 from Saudi Arabia to fund a new mosque in San Diego." *See* CJI at 424.

(289)   FBI investigations also determined that Bayoumi communicated with AHIF regarding AHIF's "interest in appointing the imam of the mosque in Cajon, California, that Bayoumi managed." *Id.* at 436.

(290)   The construction of mosques outside of Saudi Arabia and placement of Wahhabi imams in mosques and Islamic centers abroad were two of the most important goals and functions of the Ministry of Islamic Affairs during this period, in support of its mission to spread Wahhabism globally.

(291)   Relatedly, at the time of Bayoumi's communications with AHIF about the selection of an imam for the mosque Bayoumi managed, that organization was headed by the Saudi Minister of Islamic Affairs, supervised by the Ministry of Islamic Affairs, and actively coordinating with al Qaeda.

(292)   Bayoumi's other reported activities while in the United States closely relate to the mission and work of the Ministry of Islamic Affairs as well.

(293)   For example, Bayoumi maintained extensive connections to extremist clerics engaged in propagating Wahhabi Islamic doctrine in the United States and elsewhere, with regard to "religious" matters in particular, including Thumairy, Aulaqi, and "Abd al-Rahman Barzanji, and imam in Norway who, according to FBI documents, has suspected ties to high level al Qaeda members."

(294)   In addition, Bayoumi's own writings could "be interpreted as jihadist" according to FBI analysts, and his Saudi passport contained "a cachet that intelligence investigators associate with possible adherence to al Qaeda," according to the 9/11 Commission, further indications of his role in advancing extremist Wahhabi objectives. *See* 9/11 Commission Final Report at 516. The Saudi passports of at least three of the 9/11 hijackers, including Hazmi and Mihdhar, included the same indicator of extremism and "adherence to al Qaeda." *See id.*

(295)   Bayoumi also interjected himself aggressively into the activities of the local Muslim community, and the Saudi student community in particular (despite his advanced age), including through involvement in the Saudi student club.

(296)   Several witnesses who interacted with him in those settings indicated to the FBI that Bayoumi was responsible for monitoring Saudi students and citizens living in the United States, as reflected by his persistent videotaping of their activities and other factors, and described him as some kind of "agent" working for the Saudi government in an undisclosed capacity.

(297)   The covert monitoring of Saudi students living outside the Kingdom was a common function and activity of the Saudi embassies and consulates during that period, carried out principally by the Ministry of Islamic Affairs, as a component of the Ministry's role in protecting the Kingdom's Islamic character.

(298)   In this regard, a report published by the Sydney Morning Herald concerning activities of the Saudi embassy in that country, based on a review of Saudi government cables, is insightful. According to the report, the cables reflect "sustained Saudi efforts to influence political and religious opinion within [local] Arabic and Islamic communities," that the Saudi embassies "pay close attention to the political and religious beliefs of Saudi university students studying [abroad] with reports sent to" officials in the Kingdom, and that the embassies coordinate "funding for building mosques and supporting Islamic community activities."

(299)   Bayoumi's activities undertaken in the United States while receiving a salary from the Saudi government (and performing no other duties for the Kingdom), and while communicating on a systemic basis with the Kingdom's diplomatic missions, align completely with these documented functions of the Kingdom's embassies and consulates.

(300)   The circumstances surrounding Bayoumi's assistance to the hijackers further evidence that his undisclosed duties for the Saudi government involved the performance of tasks assigned to him by the Wahhabi extremists in the Kingdom's embassies and consulates.

(301)   In this regard, U.S. investigations have established that Bayoumi met and offered to assist the hijackers immediately following a meeting with Thumairy in the Saudi consulate, and that a third subject of the ongoing investigation "tasked Thumairy and Bayoumi with assisting the hijackers." *See* Summary Report at 4.

(302)   These facts indicate that Bayoumi was acting within a chain of command and direction in which he was subordinate to Thumairy and a third person with common authority over both of them. The fact that the third individual had such authority over both Thumairy and Bayoumi indicates that that person was a more senior Saudi official.

(303)   The declassified "28 pages" of the Congressional Joint Inquiry Report, meanwhile, draw a direct parallel between Bayoumi's role for the Saudi government and that of another extremist with deep connections to the Saudi government's Wahhabi proselytizing apparatus in the United States, Mohammed al Qudhaeein, who as discussed below also provided aid to the September 11th plotters from within the United States.

(304)   Like Bayoumi, Qudhaeein was purportedly in the United States as a student; was "in frequent contact with Saudi government establishments in the United States;" including officials from the Ministry of Islamic Affairs; was "very involved in the affairs of the local Saudi community," and was "receiving money from the Saudi government." *See* CJI at 438.

(305)   Based on these and other factors, the FBI described Qudhaeein's "profile" as "similar to that of Bayoumi and Basnan." *See id.* at 434.

(306)   This assessment and the facts supporting it, coupled with the related findings pertaining to Basnan, further evidence that the Saudi government had a network of employees and agents in the United States prior to 9/11 performing undisclosed functions for the Kingdom; that the duties of those employees and agents involved in the advancement of the Wahhabi agenda of the Ministry of Islamic Affairs; and that Bayoumi was one of those employees and agents.

(307)   Basnan's true functions for the Saudi government mirrored those performed by Bayoumi, with whom Basnan closely interacted and had unusual financial dealings.

(308)   Basnan entered the United States in 1996 on a tourist visa, even though he was in fact working for the Saudi government.

(309)   Basnan had "many ties to the Saudi Government, including past employment by the Saudi Arabian Education Mission," a component of the Saudi Embassy falling under the Ministry of Islamic Affairs' authority. *See* CJI at 417.

(310)   According to a CIA memo, Basnan reportedly received funding and possibly a fake passport from Saudi government officials. *Id.*

(311)   This funding included substantial transfers from a charity under the control of the extremists in the Kingdom's embassy in Washington, D.C.

(312)   Like Bayoumi, Basnan had extensive ties to Wahhabi extremists and terrorists in the United States and elsewhere, and witnesses who interacted with him also described Basnan as some kind of "agent" for the Saudi government.

(313)   These and other facts establish that Basnan was, like Bayoumi, an employee and agent of the Saudi government responsible for performing activities in furtherance of the agenda of the Ministry of Islamic Affairs, under the direction of the Saudi embassies and consulates in the United States.

(314)   The critical support Thumairy, Bayoumi, and Basnan provided to the 9/11 hijackers as employees and agents of the Saudi government was, meanwhile, well within the scope of their office, employment, and agency in furthering the radical mission and agenda of the Ministry of Islamic Affairs and Kingdom's government proselytizing apparatus.

(315)   Saudi Arabia established the Ministry of Islamic Affairs in 1993, in response to intense pressure from the Kingdom's Wahhabi clerics, who sought greater government resources and platforms to advance their Wahhabi agenda globally.

(316)   As the 9/11 Commission explained, al Qaeda finds inspiration and religious justification for its actions "in a long tradition of intolerance" that flows "through the founders of Wahhabism," and the Kingdom's Ministry of Islamic Affairs "uses zakat and government funds to spread Wahhabi beliefs throughout the world." *See* 9/11 Commission Report at 362, 372.

(317)   Following its formation and under the control of the Kingdom's government clerics, the Ministry of Islamic Affairs quickly evolved into "a stronghold of zealots," with global reach and operations. The Ministry assumed control over Saudi Arabia's da'awa activities outside of the Kingdom, carried out principally through the Kingdom's proselytizing arms under the direction and control of the Ministry, and established offices in the Kingdom's diplomatic missions, which it populated with extremist clerics like Thumairy.

(318)   During the decade preceding the September 11th Attacks, the Ministry of Islamic Affairs used the government platforms and funds available to it to pursue an extremist and anti-American global agenda, which included broad support for jihadist causes.

(319)   Of particular relevance in these respects, 9/11 Commissioner John Lehman has testified that:

> At least until September 11, 2001, the Islamic Affairs Departments of Saudi Arabia's diplomatic missions throughout the world were populated and controlled

by Wahhabi imams from the Kingdom Ministry of Islamic Affairs, like Fahad al Thumairy. Wahhabism is a puritanical, intolerant and virulently anti-American strand of Islam, and the state religion of the Kingdom of Saudi Arabia. The Kingdom has dedicated vast sums over the last several decades to promote the Islamist agenda of Saudi Arabia's Wahhabi clerics. This vast Saudi funding has been deployed to promote Wahhabi teachings throughout the world, fueling the jihadist tide that now confronts the civilized world. Wahhabi teachings form the ideological foundation for al Qaeda and a host of other jihad organizations that threaten our national security, including the so-called Islamic State of Iraq and the Levant (ISIL, a.k.a. ISIS).

The links between Saudi Arabia's Wahhabi clerics and al Qaeda did not exist solely at the ideological level, but rather also involved collaboration on financial and logistical fronts. Saudi clerics, paid by the government of the Kingdom and preaching at state funded mosques, issued fatwas that provided religious justification for al Qaeda's terrorist actions. By the time our Commission began its work, it was already well known in intelligence circles that the Islamic Affairs Departments of Saudi Arabia's diplomatic missions were deeply involved in supporting Islamic extremists.

(320)   Commissioner Lehman's testimony concerning the Ministry of Islamic Affairs' extremist agenda, and deep involvement in jihadist causes during the years preceding the September 11th Attacks, is amply supported by the pervasive involvement of the da'awa organizations under its control in supporting al Qaeda; the extensive connections between employees of the Ministry of Islamic Affairs and terrorists; the involvement of employees of the Ministry of Islamic Affairs in recruiting and fundraising activities on behalf of al Qaeda; the jihadist content of literature distributed by the Ministry of Islamic Affairs; and the numerous counter-terrorism initiatives targeting the Ministry of Islamic Affairs after 9/11 (including the Kingdom's removal of 3,500 clerics from the Ministry's payroll and re-education of an additional 20,000).

(321)   The range of terrorist connections maintained by the very employees of the Ministry of Islamic Affairs who aided the 9/11 hijackers, including Thumairy, Bayoumi, and Basnan, further demonstrate the Ministry's extremist character during the period leading up to the September

11th Attacks, and confirm that collaborating with jihadists was within the scope of the office, employment, and agency of those individuals.

### Additional Assistance Provided by Saudi Government Employees and Agents Qudhaeein, Shalawi, Hussayen, Fakihi, and Mohamed

(322)   Plaintiffs' claims concerning the witting involvement of Thumairy, Baoyumi, and Basnan in supporting the September 11th hijackers, and deep connections between the Ministry of Islamic Affairs and terrorism during the period leading up to the attacks, are further reinforced and supported by declassified intelligence documents evidencing the involvement of five additional employees of the Saudi government's religious apparatus in also knowingly providing substantial assistance to the September 11th hijackers, plotters, and al Qaeda: Mohammed al Qudhaeein, Hamdan al Shalawi, Muhammed Jabar Fakihi, Saleh al Hussayen, and Omar Abdi Mohamed.

(323)   The tortious acts of those additional employees and agents of the Saudi government were likewise committed in the course of their employment and agency in advancing the extremist agenda of the Kingdom's Ministry of Islamic Affairs and related components of the Saudi government's Wahhabi proselytizing apparatus.

### Mohammed al Qudhaeein and Hamdan al Shalawi

(324)   Qudhaeein and Shalawi were additional undeclared employees and agents of the Saudi government, whose duties also involved the performance of activities on behalf of the Ministry of Islamic Affairs.

(325)   Like Bayoumi, Qudhaeein was purportedly in the United States as a student. He was "in frequent contact with Saudi government establishments in the United States," was "very involved in the affairs of the local Saudi community," and was "receiving money from the Saudi government." *See* CJI at 434.

(326)   Based on these and other factors, FBI investigators described Qudhaeein's "profile" as "similar to that of Bayoumi and Basnan." *See id.*

(327)   During a 1999 flight from Phoenix to Washington, D.C., to attend an event at the Saudi embassy, Qudhaeein participated along with Shalawi, who had trained at the Afghan terrorist training camps, in a dry run for the 9/11 attacks.

(328)   During that flight, Qudhaeein "went to the front of the plane and attempted on two occasions to enter the cockpit," and the FBI "believes both men were specifically attempting to test the security procedures of America West Airlines in preparation for and in furtherance of [UBL]/al Qaeda operations." *See id.* at 433-34.

(329)   Shalawi was himself a long time employee of the Saudi government as well, and was receiving a stipend from the Saudi government at the time of the incident.

(330)   Both Qudhaeein and Shalawi told investigators that the Saudi embassy in Washington had paid for their tickets. *See id.* at 433.

(331)   The event they were traveling to attend was a symposium hosted by the Saudi embassy in collaboration with the Institute for Islamic and Arabic Sciences in America ("IIASA"), a Saudi government proselytizing arm with extensive ties to terrorism.

(332)   Following the September 11th Attacks, the United States revoked the diplomatic visas of 16 people associated with IIASA. These individuals were identified as using their diplomatic status as representatives of the Saudi Embassy in Washington, D.C. to promote and spread radical Wahhabi ideology in the United States. According to senior law enforcement officials, in all, approximately 70 individuals with Saudi diplomatic credentials were expelled from the United States as part of "an ongoing effort to protect the homeland."

(333)   In response to the revocation of the visas, IIASA issued a "Declaration About the

Revoking of Diplomatic Visas," in which IIASA confirmed that it was a Saudi government arm

conducting da'awa activities under the auspices of the Saudi embassy:

> The Institute of Islamic and Arabic Sciences in America (IIASA) is a non-profit
> educational institution affiliated with Imam Muhammad Ibn Saud Islamic University
> (IMSIU) in Riyadh, Kingdom of Saudi Arabia, which was established by the order of the
> Custodian of the Two Holy Sanctuaries King Fahd Ibn [Abdulaziz] more than fifteen
> years ago. This Institute continues to receive support from the University and from the
> Royal Embassy of the Kingdom of Saudi Arabia…
>
> ***
>
> Under the auspices of the Royal Embassy of the Kingdom of Saudi Arabia and its
> Ambassador to the USA, the personnel of the Institute were registered at the Imam
> Muhammad Ibn Saud Islamic University and the US State Department as diplomatic
> personnel and consequently were granted A2 visas since the IMSIU is a government
> University.

(334)   The U.S. State Department's actions coincided with investigations conducted by the

Internal Revenue Service and Senate Finance Committee into IIASA and its links to terrorist

groups, which eventually led to its closure.

(335)   In the years after the 1999 incident, both Qudhaeein and Shalawi held posts as

government employees at IMSIU, the parent of IIASA, a further indication of their longstanding

ties to the Saudi government.

(336)   In the fall of 2000, Shalawi received training at an al Qaeda camp in Afghanistan where

several of the 9/11 muscle hijackers were simultaneously receiving training.

(337)   Based on intelligence indicating Shalawi's presence at the camp, the United States placed

him on a terrorist watch list and he was denied a visa when he attempted to re-enter the United

States in August 2001, likely as part of an al Qaeda operation.

**Saleh al Hussayen**

(338)   Saleh al Hussayen was a senior government cleric who held various positions in the Saudi government over a period of many years.

(339)   In the weeks prior to the attacks, Hussayen was in the United States on a fundraising mission with members of the Islamic Association of North America ("IANA"), a radical Islamic organization in Ypsilanti, Michigan, which receives money from the Saudi government and other Saudi donors. The IANA has promoted teachings and fatwas issued by radical Saudi clerics Safar Hawali and Salman Ouda, which advocated violence against the United States. Hawali and Ouda were identified in the 1993 World Trade Center bombing trial as spiritual advisors to Osama bin Laden.

(340)   On September 6, 2001, Hussayen arrived in Herndon, Virginia. Then, just days before the September 11th Attacks, Hussayen abruptly moved from his original hotel to the Marriott Residence Inn, where September 11th hijackers Hazmi, Mihdhar, and Hanjour were also staying on the eve of the attacks.

(341)   Directly after the attacks, FBI agents attempted to interview Hussayen in his hotel room. In an apparent attempt to avoid questioning, Hussayen feigned a seizure, prompting his transfer to the emergency room. Physicians found nothing wrong with him, and Hussayen fled the United States before law enforcement was able to locate and re-interview him. *See* CJI at 431.

(342)   The declassified "28 pages" provide further details of the FBI's investigation of Hussayen, including the FBI's determination that Hussayen "is apparently a 'Saudi Interior Ministry employee/official'" and that the FBI agents who interviewed him "believed he was being deceptive" when he "claimed to not know the hijackers." *Id* at 418, 430-31.

(343)   Hussayen's ties to terrorist elements, precipitous relocation to the same hotel as the 9/11 hijackers on the eve of the attacks, deceitfulness to U.S. investigators, and remarkable efforts to

avoid questioning by the U.S. authorities concerning his ties to the hijackers, all indicate that he provided aid and assistance to the hijackers in support of the September 11th Attacks.

(344)   Even before disclosure of the additional facts in the Congressional Joint Inquiry Report, the United States Court of Appeals for the Second Circuit found that Hussayen's "travels to the United States shortly before the September 11, 2001 attacks, as well as his decision to switch hotels to stay in the same hotel as at least three of the hijackers…not only suggest the possibility that he may have provided direct aid to members of al Qaeda, but that also raise a plausible inference that he may have intended his alleged indirect support of al Qaeda to cause injury in the United States." *See O'Neill v. Asat Trust Reg.* (In Re: Terrorist Attacks on September 11, 2001 (Asat Trust Reg.)), 714 F.3d 659, 679 (2d Cir. 2013).

## Muhammed Jabar Fakihi

(345)   Muhammed Jabar Fakihi was an employee of the Ministry of Islamic Affairs, who served as head of the Islamic Affairs offices at the Saudi Embassy in Berlin, beginning in or around June 2000. Like Thumairy, Fakihi was a Wahhabi extremist with extensive ties to terrorism.

(346)   Investigations following the September 11th Attacks revealed that Fakihi was in direct contact with members of the Hamburg al Qaeda cell that coordinated the September 11th Attacks, diverted extensive funds to al Qaeda from Saudi embassy accounts, and was "organizationally involved" in bin Laden's organization.

(347)   The "Hamburg Cell" consisted of key operatives in the September 11th Attacks, including Mohammed Atta (the ringleader of the 19 hijackers and pilot of American Airlines Flight 11), Marwan al Shehhi, Ziad Jarrah, Ramzi Binalshibh, Mounir el Motassadeq, Said Bahaji, Zakariya Essabar, Abdelghani Mzoudi, and others.

(348)   As a representative of the Saudi Embassy and Ministry of Islamic Affairs, Fakihi frequently attended the Saudi funded al Nur Mosque in Berlin.

(349)   A notorious haven for Islamic extremists, the mosque often hosted clerics that preached intolerance of non-Muslims and justified violence in the name of defending Islam. Dr. Salem Rafei, a Lebanese cleric who served as an imam at the mosque, openly supported Palestinian suicide attacks and called Muslims to kill all unbelievers standing in the way of Islam. Documents containing the mosque's address were seized from individuals detained by Pakistani authorities who are alleged to have received military training at al Qaeda camps in Afghanistan in 2001.

(350)   Fakihi, himself an adherent to the most extreme teachings of Wahhabi ideology, advocated for the development of mosques across Europe and told his superiors in the Kingdom that his ultimate goal was to turn Berlin into an Islamic proselytizing center for Eastern Europe. In June 2000, Fakihi wrote a letter to the Saudi Minister of Islamic Affairs, Saleh bin Abdulaziz al Ashaikh, proposing to turn the al Nur Mosque into a center for Islamic missionary activity aimed at "ethnic European" populations in Eastern Europe. Fakihi, who planned to move his office to the al Nur Mosque, proposed to carry the word of Islam to Poland, the Czech Republic and Hungary, the last of "which once belonged to the Islamic Caliphate under Ottoman Empire rule."

(351)   The expansion of the al Nur Mosque was originally conceived by Ahmed al Dubayan, Fakihi's predecessor in the Islamic Affairs office in the Saudi embassy in Berlin, who served as a mentor to Fakihi and likely had contact with members of the Hamburg al Qaeda cell at the al Nur Mosque as well.

(352)   Fakihi arranged for the expansion of the al Nur mosque consistent with the vision outlined in his letter, using funds from AHIF, one of the al Qaeda affiliated charities supervised and directed by the Saudi Ministry of Islamic Affairs and headed by the Minister of Islamic Affairs.

(353)   Mohammad Atta and other members of the Hamburg cell, including Mounir el Motassadeq, were seen visiting the mosque. German investigators believe Fakihi met with Motassadeq at al Nur. Fakihi's business card was found in the apartment of Motassadeq, who was later arrested and convicted in a German court for being an accessory to murder relative to the September 11th Attacks, given his membership in the Hamburg cell and his knowledge and involvement in the preparation of the plans to hijack the planes.

(354)   In March 2003, German police raided a suspected terrorist cell in Berlin and arrested half a dozen men who were planning a large scale terrorist attack in Germany. Bomb-making equipment, forged passports, flight-simulator software, chemicals and a handbook for brewing poisons were seized during the raid. German police said Fakihi met frequently at the al Nur mosque with the terror cell's leader, Ihsan Garnaoui, a Tunisian al Qaeda member.

(355)   Two days after the arrests, on March 22, 2003, the German Foreign Ministry, following a recommendation from the country's domestic intelligence service, told the Saudi Embassy that Fakihi's diplomatic accreditation would be withdrawn unless he left the country. That same day, Dubayan flew from London to Berlin to meet Fakihi, and Fakihi then flew back to Saudi Arabia the following day.

(356)   Saudi authorities thereafter obstructed the German government's further investigation into links between Fakihi and the members of the Hamburg cell. The Saudi Embassy in Berlin never responded to a formal request from German prosecutors to explain the presence of Fakihi's

business card in Motassadeq's apartment or an alleged meeting between Fakihi and Motassadeq in Berlin shortly before the al Qaeda member's arrest in November 2001. In an interview with the Wall Street Journal in 2003, a German police official stated that the Saudi Embassy failed to cooperate in the probe.

(357)   Nonetheless, evidence presented to U.S. officials led them to conclude that Fakihi was "more than just a sympathizer of bin Laden" and was "organizationally involved" with bin Laden's al Qaeda network.

(358)   The 9/11 Commission staff conducted an interview with Fakihi in October 2003 in Riyadh relative to his duties with the Ministry of Islamic Affairs, his association with the al Nur mosque, and his relationships with Motassadeq and Garnaoui. The interview was conducted under the watchful eye of the Saudi secret police, the Mabahith. According to the 9/11 Commission's memorandum concerning the interview, Fakihi's testimony on a material issue "did not appear credible."

**Omar Abdi Mohamed**

(359)   Omar Abdi Mohamed entered the United States in or around 1998 as a religious worker.

(360)   In fact, Mohamed was an employee of Saudi Arabia's Ministry of Islamic Affairs, holding the title "Propagator," material facts neither he nor the Kingdom disclosed on his visa application.

(361)   Following his entry into the United States and while employed by the Ministry of Islamic Affairs, Mohamed established a purported charity called the Western Somali Relief Agency ("WSRA") in San Diego under supervision of his superiors with the Ministry of Islamic Affairs, to serve as a front for funding al Qaeda.

(362)   Between December 1998 and May 2001, Mohamed issued 65 checks totaling nearly $400,000 to another prominent al Qaeda front called Dahab Shil, the Pakistan office of which was at the time under the control of 9/11 mastermind Khalid Sheik Mohammed, who at that very time was planning the September 11th Attacks and providing funds to the 9/11 hijackers.

(363)   Following the September 11th Attacks, Mohamed was deported from the United States following his conviction on immigration charges, including for failing to disclose that he was employed by the Saudi government.

### Additional Saudi Government Contacts
### With the 9/11 Hijackers, Plotters, and al Qaeda

(364)   U.S. investigations concerning the September 11th Attacks and sources of support for al Qaeda before the attacks have documented a range of other links between person and institutions associated with the Saudi government and elements of al Qaeda, including the September 11th hijackers and plotters.

(365)   The Congressional Joint Inquiry surveys some of these ties, which indicate additional sources of support from within the Saudi government for al Qaeda and the September 11th plot.

(366)   Discovery relating to these additional linkages between Saudi government officials, employees, and agents and elements of al Qaeda is likely to adduce further evidence in support of Plaintiffs' claims.

### THE TERRORIST ATTACKS

### Executing the September 11th Terrorist Attacks

(367)   On September 11, 2001, Mohammed Atta, Abdulaziz al Omari, Satam al Suqami, Waleed al Shehri, and Wail al Shehri hijacked American Airlines Flight 11, a Boeing 767, which had departed Boston at approximately 7:59 a.m. They flew Flight 11 into the North Tower of the

World Trade Center in Manhattan at approximately 8:45 a.m., causing the collapse of the tower and the deaths of thousands of people.

(368)   On September 11, 2001, Hamza al Ghamdi, Fayez Banihammad, Mohand al Shehri, Ahmed al Ghamdi, and Marwan al Shehhi hijacked United Airlines Flight 175, a Boeing 767, which had departed from Boston at approximately 8:14 a.m.  Upon hijacking United Flight 175, the terrorists murdered the pilot and thereafter flew Flight 175 into the South Tower of the World Trade Center in Manhattan at approximately 9:03 a.m., causing the collapse of the tower and the deaths of thousands of people.

(369)   On September 11, 2001, Khalid al Mihdhar, Majed Moqed, Nawaf al Hazmi, Salem al Hazmi, and Hani Hanjour hijacked American Airlines Flight 77, a Boeing 757, which had departed from Washington National Airport in Virginia, bound for Los Angeles, at approximately 8:10 a.m. They flew Flight 77 into the Pentagon in Arlington, Virginia at approximately 9:37 a.m., causing the deaths of 184 people.

(370)   On September 11, 2001, Saeed al Ghamdi, Ahmed al Nami, Ahmed al Haznawi, and Ziad Jarrah hijacked United Airlines Flight 93, a Boeing 757, which departed Newark, New Jersey for San Francisco at approximately 8:42 a.m. After encountering resistance from the passengers, the terrorists crashed Flight 93 into a field in Shanksville, Pennsylvania, at approximately 10:06 a.m., killing 40 people. Having been given the information from loved ones concerning the terrorist attacks in New York, the passengers and crew of Flight 93 acted on that information and averted further disaster at the expense of their own lives.

(371)   In total, the September 11th Attacks resulted in the murder of 3,029 people, the injury of thousands more, and the devastation and shock of survivors, families and friends of victims, and the nation as a whole.

## U.S. INVESTIGATION FULLY SUPPORTS PLAINTIFFS' CLAIMS

(372)   Investigations conducted by the U.S. government, including those of the 9/11 Commission and Congressional Joint Inquiry, broadly and directly support Plaintiffs' factual allegations and theories.

(373)   As discussed above, 9/11 Commission members John Lehman and Bob Kerrey, along with 9/11 Congressional Joint Inquiry Co-Chair Bob Graham, have provided sworn affidavit testimony, based on their decades of experience in national security matters and direct involvement in two of the principle investigations into the September 11th Attacks, that supports Plaintiffs' claims.

(374)   Further, several additional 9/11 Commission members and staff have joined Secretary Lehman and Senator Kerrey in the last year in directly rejecting the Kingdom of Saudi Arabia's false claims of exoneration and characterizations of the Commission's investigation.

(375)   Most recently, the declassification of the 2012 Summary Report of the ongoing FBI and DOJ investigations of Bayoumi and Thumairy and associated individuals who aided the 9/11 hijackers has confirmed central facts underlying Plaintiffs' claims based on the tortious acts of Bayoumi and Thumairy.

(376)   Separately, Plaintiffs' claims based on the funding and material sponsorship of al Qaeda by the Kingdom's proselytizing arms are fully supported by the 9/11 Commission's finding that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda."

(377)   Stated most simply, U.S. investigations broadly support Plaintiffs' claims that the September 11th Attacks were the culmination of a conspiracy among all Defendants to plan, finance, support and execute terrorist murder.

## COUNT I
### All Plaintiffs v. Iran and MOIS
### 28 U.S.C. § 1605A

(378)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(379)   At all relevant times, Defendants Iran and MOIS were and remain designated as state sponsors of terrorism as required by 28 U.S.C.§ 1605A(a)(2)(A)(i)(I) to maintain an action under § 1605A of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

(380)   The conduct of the al Qaeda hijackers constituted acts of extrajudicial killing, torture, aircraft sabotage, and hostage taking within the meaning of FSIA § 1605A(a)(1).

(381)   Defendants Iran and MOIS provided material support and resources to al Qaeda in furtherance of those acts of the al Qaeda hijackers.

(382)   At all relevant times, al Qaeda and the hijackers were agents of Iran acting within the scope of their agency.

(383)   The conduct of Defendants Iran and MOIS violated the provisions of the FSIA, in particular 28 U.S.C. §1605A, and all Plaintiffs suffered damages as a result of that violation.

(384)   Plaintiffs' injuries, and the consequences resulting there from, were proximately caused by the intentional and reckless acts of Defendant Iran and MOIS as described herein.

(385)   As a direct and proximate result of the September 11th Attacks, Plaintiffs have been deprived of comfort and support, and have suffered damages including pain and suffering, trauma, emotional distress, loss of life's pleasures, loss of earnings and earnings capacity, and other items of damages as set forth fully in the paragraphs above which are incorporated herein by reference.

(386)   As a result of the intentional, reckless, and negligent acts of the Defendants as described

above, the Plaintiffs were placed in apprehension of harmful and offensive bodily contact

(assault), suffered offensive and harmful bodily contact (battery), suffered extreme fear, anxiety,

emotional and psychological distress (intentional infliction of emotional distress), and were

mentally and physically harmed prior to and after their injuries.

(387)   The actions of Defendants Iran and MOIS were malicious, outrageous, and in willful,

wanton, and reckless disregard of the rights of the Plaintiffs. Defendants Iran and MOIS intended

to carry out actions that would cause injury to the Plaintiffs.

(388)   Plaintiffs are entitled to solatium and other damages, as stated in 28 U.S.C. §

1605A(c)(4).

(389)   As a result of the intentional, malicious, outrageous, willful and wanton conduct,

Defendant Iran is liable to all Plaintiffs for punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Iran and MOIS, jointly

and severally, and/or individually, in an amount authorized by governing law to be determined at

trial, for compensatory damages, punitive damages, and solatium, plus pre-and post-judgment

interest, costs, fees, and other such relief as the Court may deem appropriate under the

circumstances.

## COUNT II
### All Plaintiffs v. All Defendants
### 28 U.S.C. § 1605(a)(5): Liability for Non-Commercial Torts

(390)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect

as if alleged herein.

(391)   The Defendants forfeited their right to claim immunity of the Foreign Sovereign

Immunities Act. Pursuant to 28 U.S.C. § 1605(a)(5), all Defendants who are officials,

employees, or agents of the foreign state defendants are individually liable to Plaintiffs for damages caused by their acts which resulted in the injury of the Plaintiff.

(392)   The Defendants and the actions of their agencies and instrumentalities as described herein are subject to liability for said acts resulting in personal injury and death in the United States caused by the tortious acts or omissions of the foreign state Defendants, their officials, and employees while acting within the scope of their office and employment, and thus have forfeited their right to claim immunity pursuant to 28 U.S.C. § 1605(a)(5).

(393)   As a direct result and proximate cause of the conduct of the foreign state Defendants and their agencies, instrumentalities, officials, employees, and agents that violated the federal and common laws cited herein, Plaintiffs suffered damages as set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, their agents and instrumentalities, and each of their officials, employees and agents, jointly, severally, and/or individually, in an amount authorized by governing law to be determined at trial, for compensatory damages, punitive damages, and solatium, plus pre-and post-judgment interest, costs, fees, and other such relief as the Court may deem appropriate under the circumstances.

**COUNT III**
**All Plaintiffs v. All Defendants**
**18 U.S.C. § 2333(d) (JASTA): Aiding and Abetting and Conspiring with Al Qaeda to Commit the September 11th Attacks Upon the United States**

(394)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(395)   As set forth above, Defendants knowingly provided material support, resources, and substantial assistance to, and conspired with, al Qaeda over many years, with an awareness and intent to further al Qaeda's campaign to carry out terrorist attacks against the United States and its citizens on September 11th, 2001.

(396)   As set forth above, Plaintiffs' claims against Defendants relating to their tortious acts in support of al Qaeda fall within the exception to sovereign immunity set forth at 28 U.S.C. § 1605B, and Plaintiffs are therefore authorized to assert causes of action against Defendants pursuant to the Anti-Terrorism Act, 18 U.S.C. §§ 2331 *et seq*.

(397)   Through the tortious acts in support of al Qaeda described above, Defendants aided and abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the United States and its citizens on September 11, 2001, in violation of 18 U.S.C. § 2333(d).

(398)   At the time of the September 11th Attacks, al Qaeda was a designated foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189).

(399)   The funding and other material support Defendants provided to al Qaeda, as described above, enabled al Qaeda to acquire the global strike capabilities employed on September 11, 2001, and was essential to al Qaeda's ability to carry out the attacks.

(400)   During the decade preceding the September 11th Attacks, al Qaeda repeatedly made clear, through both declarations and actions, its intent to use funds and resources provided to it to conduct large-scale terrorist attacks in order to kill innocent civilians, destroy property on a mass scale, and cause catastrophic economic harm.

(401)   The September 11th Attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by Defendants.

(402)   Plaintiffs suffered injuries to their persons and property by reason of the September 11th Attacks and Defendants' tortious acts in support of al Qaeda.

**WHEREFORE,** Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, together with treble damages, punitive

damages, pre-and post-judgment interest, attorneys' fees, costs of this action and other such

relief as the Court may deem appropriate under the circumstances.

## COUNT IV
## All Plaintiffs v. All Defendants
## 18 U.S.C. § 2333(a): Aiding and Abetting and Conspiring with al Qaeda to Commit the September 11th Attacks

(403)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect

as if alleged herein.

(404)   As enacted in 1992, the express civil cause of action established under 18 U.S.C. §

2333(a) authorized claims for aiding and abetting and conspiring to commit an act of

international terrorism.

(405)   Through the tortious acts in support of al Qaeda described above, Defendants aided and

abetted, and conspired with, al Qaeda to carry out acts of international terrorism against the

United States and its citizens on September 11, 2001, in violation of 18 U.S.C. § 2333(a).

(406)   The relentless campaign by al Qaeda and its material supporters to carry out terrorist

attacks against the United States and its citizens, which culminated in the September 11th

Attacks, involved continuous acts of violence and acts dangerous to human life that violate the

criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332. *See*

18 U.S.C. 2332(a) (prohibiting conduct transcending national boundaries: killing or attempting to

kill persons within the United States; causing serious bodily injury or attempting to cause serious

bodily injury to persons within the United States; destroying or damaging any structure,

conveyance, or other real or personal property within the United States; or attempting or

conspiring to destroy any structure conveyance, or other real or personal property within the

United States).

(407)   Plaintiffs suffered injuries to their persons by reason of acts committed by al Qaeda that involved the murder and attempted murder of persons within the United States, and the mass destruction of real and personal property within the United States, in violation of the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332.

(408)   Through the tortious acts in support of al Qaeda described above, Defendants aided and abetted, and conspired with, al Qaeda to carry out act of international terrorism against the United States and its citizens on September 11th, 2001, in violation of 18 U.S.C. §§ 2332(a), 2332(b), 2332(c), and 2333.

(409)   Defendants knew at all times that they were providing material support for al Qaeda's campaign to carry out acts of international terrorism against the United States and its citizens, and were aware and intended that the resources they provided would substantially assist al Qaeda in that objective.

(410)   Defendants also agreed to combine and conspire with al Qaeda and other persons to act unlawfully, in the manners set forth in this Complaint, and committed overt acts in furtherance of the conspiracy. At all relevant times, Defendants knew of the conspiracy and the roles of the al Qaeda elements they were supporting in furtherance of the conspiracy.

(411)   By aiding and abetting violations of 18 U.S.C. § 2332 that have caused injuries to Plaintiffs, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

(412)   By conspiring to act with al Qaeda and other components of that terrorist organization's financial, logistical, and operational infrastructure, in furtherance of their campaign to conduct terrorist attacks against the United States and its citizens in violation of 18 U.S.C. § 2332,

Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained by reason of the September 11th Attacks.

(413)   The September 11th Attacks were a direct and foreseeable result of the material support and sponsorship of al Qaeda by Defendants.

   **WHEREFORE,** Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

**COUNT V**
**All Plaintiffs v. All Defendants**
**18 U.S.C. § 2333: Committing Acts of International Terrorism**

(414)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(415)   The actions of the Defendants in providing funding and other forms of material support to al Qaeda and its agents would constitute "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population…to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

(416)   The actions of Defendants in providing funding and other forms of material support to al Qaeda and its agents, and in providing substantial assistance to al Qaeda and its agents in planning, coordinating and carrying out the September 11th Attacks in violation of 18 U.S.C. § 2333, caused injuries to the persons, businesses, or property of Plaintiffs.

(417)   By participating in the commission of violations of 18 U.S.C. §§ 2339A and 2339B that have caused Plaintiffs to be injured in their persons, Defendants have engaged in acts of international terrorism and are liable pursuant to 18 US.C. § 2333 for any and all damages Plaintiffs have sustained as a result of such injuries.

(418)   By virtue of their willful violations of 18 U.S.C. § 2339C, which proximately caused the injuries suffered by Plaintiffs, Defendants committed acts of international terrorism and are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

(419)   The actions of Defendants in providing funding and other forms of material support to al Qaeda and its agents either occurred outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

(420)   Accordingly, the actions of Defendants in providing funding and other forms of material support to al Qaeda and its agents constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333 and through incorporation of 18 U.S.C. §§ 2339A, 2339B, and 2339C.

(421)   As set forth above, but for the assistance provided by Defendants, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which were a foreseeable and intended result of Defendants' material sponsorship and support of al Qaeda.

(422)   For the reasons set forth above, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have suffered to their persons and property as a result of the September 11th Attacks.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, together with treble damages, punitive

damages, pre- and post-judgment interest, attorneys' fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VI
### Kathy Dillaber v. All Defendants
### Assault and Battery

(423)   Plaintiff Katherine Dillaber repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(424)   As a result of the intentional, malicious, reckless, conspiratorial, criminal, unprivileged, nonconsensual, grossly negligent and negligent acts of Defendants as described herein, which culminated in the September 11th Attacks, Plaintiff was placed in apprehension of harmful and/or offensive bodily contact and suffered harmful, offensive bodily contact, from which she ultimately suffered serious permanent personal injury.

(425)   By reason of all of the foregoing, Plaintiff was seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental, and emotional pain and injury, and required and received medical care and treatment, and incurred medical expenses and will continue to incur future expenses therefor, and was prevented from attending to the duties of her employment and prevented from pursuing the furthering of her career and lost salary and earnings and will lose future salary and earnings thereby.

**WHEREFORE**, Plaintiff demands judgment against Defendants for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VII
### Mary Jo Clarke v. All Defendants
### Assault and Battery

(426)   Plaintiff Mary Jo Clarke repeats and re-alleges each and every allegation set forth above with equal effect as if alleged herein.

(427)   As a result of the intentional, malicious, reckless, conspiratorial, criminal, unprivileged, nonconsensual, grossly negligent and negligent acts of Defendants as described herein, which culminated in the September 11th Attacks, Plaintiff was placed in apprehension of harmful and/or offensive bodily contact and suffered harmful, offensive bodily contact, from which she ultimately suffered serious permanent personal injury.

(428)   By reason of all of the foregoing, Plaintiff was seriously and severely injured, shocked, bruised and wounded and suffered great physical, mental, and emotional pain and injury, and required and received medical care and treatment, and incurred medical expenses and will continue to incur future expenses therefor, and was prevented from attending to the duties of her employment and prevented from pursuing the furthering of her career and lost salary and earnings and will lose future salary and earnings thereby.

WHEREFORE, Plaintiff demands judgment against Defendants for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT VIII
### All Plaintiffs v. All Defendants
### Conspiracy

(429)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(430)   As set forth above, Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate, cooperate and

engage in unlawful and tortious acts pursuant to a common course of conduct, namely the promotion and sponsoring of international terrorism, resulting in the injuries sustained by Plaintiffs.

(431)   As set forth above, Defendants conspired with, encouraged, furthered, and agreed to provide material support, funding, sponsorship, aiding and abetting and/or other material resources to al Qaeda, Osama bin Laden, and the hijackers in furtherance of this conspiracy.

(432)   As set forth above,  Defendants engaged in commonly motivated, organized, concerted and conspiratorial acts, efforts, transactions, material support, and activities designed, intended, and foreseeably certain to cause acts of international terrorism including the terrorist attacks on the United States, its citizens and society on September 11, 2001.  Co-conspirators herein continue in their quest to attack the United States, resulting in the harm to Plaintiffs, which was done pursuant to and in furtherance of this concert of action, agreement, enterprise, civil and criminal conspiracy and common scheme.

(433)   The Defendants' concert of action, scheme, enterprise and conspiracy to support and promote Osama bin Laden, al Qaeda, the hijackers, and international terrorism, was a proximate cause of the September 11th Attacks that injured Plaintiffs.

(434)   As a result of Defendants' concert of action and conspiracy to further international terrorism, Plaintiffs have suffered damages as will be shown at trial.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, jointly and severally, for an amount authorized by governing law to be determined at trial, together with punitive damages, pre-and post-judgment interest, and other such and further relied as the Court may deem appropriate under the circumstances.

## COUNT IX
### All Plaintiffs v. All Defendants

**Aiding and Abetting**

(435)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(436)   As set forth above, Defendants knowingly and substantially assisted in the sponsorship of al Qaeda in the September 11th Attacks that injured the Plaintiffs.

(437)   At the time of such aiding and abetting, Defendants knew or should have known that their role was part of an overall and ongoing illegal and tortious activity.

(438)   As set forth above, the Defendants aided and abetted in concerted efforts, transactions, acts and activities designed to cause the September 11th Attacks on the United States, its citizens, property, and freedoms.

(439)   The Defendants' aiding and abetting of terrorism through material sponsorship was a proximate case of the September 11th Attacks that injured the Plaintiffs.

(440)   As a result of the Defendants' aiding and abetting activities, Plaintiffs have suffered damages as set forth herein.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate under the circumstances.

**COUNT X**
**All Plaintiffs v. All Defendants**
**Intentional Infliction of Emotional Distress**

(441)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(442)   Defendants intended or knew or should have known that their conduct and actions would lead to the killing of or injury to innocent persons and resulting severe emotional distress.

(443)   Defendants intended and knew or should have known that the September 11th Attacks would kill, maim, and/or permanently injure people, leaving devastated survivors and family members with ongoing physical, psychological and emotional injuries and ongoing post-traumatic stress disorder on a horrific and massive scale.

(444)   The actions of Defendants were unconscionable, extreme, outrageous, and done with intentional, malicious, and willful disregard for the rights and lives of those murdered, those injured, and the surviving loved ones.

(445)   As a direct and proximate cause of the Defendants' intentional and reckless disregard for human life, Plaintiffs have suffered and will forever continue to suffer severe, debilitating, permanent emotional, physical, and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care.

(446)   The acts and conduct of Defendants were undertaken in an intentional manner intended or reasonably foreseeable to result in the killing and injuring of innocent people. These criminal and tortious acts culminated in the murder and maiming of innocent people on September 11, 2001, and beyond, causing continuing, permanent emotional, mental and physical suffering to the injured victims, their families, and loved ones of decedents.

(447)   Defendants, by engaging in this intentional and unlawful conduct, intentionally inflicted emotional distress upon the Plaintiffs.

**WHEREFORE,** Plaintiffs demand judgment, jointly and severally, against the Defendants, in the amount authorized by governing law to be determined at trial, together with

punitive damages, pre- and post-judgment interest, and such other and further relief as the Court

may deem appropriate under the circumstances.

## COUNT XI
### All Plaintiffs v. Kingdom of Saudi Arabia
### Liability Pursuant to Restatement (Second) of Torts § 317 and Restatement (Third) of Agency § 7:05:
### Supervising Employees and Agents

(448)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect

as if alleged herein.

(449)   Defendant Kingdom of Saudi Arabia was reckless in its supervision of its agents or

employees, including Fahad al Thumairy, Omar al Bayoumi, Osama Basnan, Saleh al Hussayen,

Mohammed al Qudhaeein, Muhammed Jaber al Fakihi and others, in that Defendant Kingdom of

Saudi Arabia knew of these employees' and agents' propensity for the conduct that caused injury

to Plaintiffs prior to the injuries' occurrence, and the Kingdom of Saudi Arabia failed to exercise

due care in supervising its employees and agents.

(450)   The ability of the above-referenced agents or employees to provide wide-ranging material

support to al Qaeda, Osama bin Laden, and the September 11th hijackers, referenced above, and

the resulting injuries to Plaintiffs, were caused by reason of the reckless supervision by

Defendant Kingdom of Saudi Arabia of its agents or employees.

(451)   Due to the reckless supervision on the part of Defendant Kingdom of Saudi Arabia,

Plaintiffs sustained injuries.

(452)   The injuries sustained by Plaintiffs, as a result of the recklessness of Defendant Kingdom

of Saudi Arabia, were foreseeable and Defendant Kingdom of Saudi Arabia knew or should have

known of the risk of injury to the Plaintiffs.

(453)   The torts committed by the above-referenced employees and agents of Defendant Kingdom of Saudi Arabia were committed, among other places, on the premises of the Kingdom of Saudi Arabia or with the chattels of the Kingdom of Saudi Arabia, as these employees and agents provided wide-ranging material support to al Qaeda and the September 11th hijackers from, among other places, facilities owned and operating by the Kingdom of Saudi Arabia using money and resources of the Kingdom.

   **WHEREFORE,** Plaintiffs demand judgment against Defendant Kingdom of Saudi Arabia for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and other such and further relief as the Court may deem appropriate under the circumstances.

**COUNT XII**
**All Plaintiffs v. Kingdom of Saudi Arabia**
**Liability Pursuant to Restatement (Second) of Torts § 317 and Restatement (Third) of Agency § 7:05:**
**Hiring, Selecting, and Retained Employees and Agents**

(454)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(455)   Defendant Kingdom of Saudi Arabia was reckless in its hiring, selecting, and retaining certain individuals as and for its employees and agents, including Fahad al Thumairy, Omar al Bayoumi, Osama Basnan, Saleh al Hussayen, Mohammed al Qudhaeein, Muhammed Jaber al Fakihi and others, in that Defendant Kingdom of Saudi Arabia knew of these employees' and agents' propensity for the conduct that caused injury to Plaintiffs prior to the injuries' occurrence.

(456)   Defendant Kingdom of Saudi Arabia hired, selected, and retained the above-referenced agents and employees and placed them in a situation where they could create an unreasonable risk of harm to others.

(457)   The ability of the above-referenced agents or employees to provide wide-ranging material support to al Qaeda, Osama bin Laden, and the September 11th hijackers, referenced above, and the resulting injuries to Plaintiffs, were caused by reason of the reckless hiring, selecting, and/or retention by the Defendant Kingdom of Saudi Arabia.

(458)   The injuries sustained by Plaintiffs, as a result of the recklessness of Defendant Kingdom of Saudi Arabia, were foreseeable and Defendant Kingdom of Saudi Arabia knew or should have known of the risk of injury to the Plaintiffs.

(459)   The torts committed by the above-referenced employees and agents of Defendant Kingdom of Saudi Arabia were committed, among other places, on the premises of the Kingdom of Saudi Arabia or with the chattels of the Kingdom of Saudi Arabia, as these employees and agents provided wide-ranging material support to al Qaeda and the September 11th hijackers from, among other places, facilities owned and operating by the Kingdom of Saudi Arabia using money and resources of the Kingdom.

**WHEREFORE,** Plaintiffs demand judgment against Defendant Kingdom of Saudi Arabia for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, and other such and further relief as the Court may deem appropriate under the circumstances.

**COUNT XIII**
**All Plaintiffs v. Kingdom of Saudi Arabia**
**18 U.S.C. § 1962(a)-(d): CIVIL RICO**

(460)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(461)   Defendant Kingdom of Saudi Arabia constitutes a "person" as such term is used in 18 U.S.C. § 1961(3).

(462)   Defendant Kingdom of Saudi Arabia, as principal, agent, and co-conspirator, performed "racketeering activity" as defined in 18 U.S.C. § 1961(1) by knowingly providing material support to Osama bin Laden and al Qaeda prior to the September 11th Attacks, as described above.

(463)   Defendant Kingdom of Saudi Arabia, including the agents, officials, officers, and employees of Defendant Kingdom of Saudi Arabia whose attributable conduct in support of al Qaeda is discussed above, and Osama bin Laden and al Qaeda, were associated in fact with a common purpose of spreading extremist Wahhabi doctrine and rule, including through acts of jihad, and constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce (the "RICO Enterprise").

(464)   The RICO Enterprise constitutes an "enterprise" because all members thereof, including but not limited to Defendant Kingdom of Saudi Arabia, had the same goal of spreading Wahhabi doctrine and rule, including through acts of jihad, and in fact worked together to achieve that goal.

(465)   Defendant Kingdom of Saudi Arabia committed two or more of the aforesaid acts of racketeering activity within ten years of one another by continuously participating in the sponsorship of al Qaeda, and thereby committed a "pattern" of racketeering activity as defined in 18 U.S.C. § 1961(5).

(466)   Defendant Kingdom of Saudi Arabia, as principal, agent of, and co-conspirator with Osama bin Laden and al Qaeda, used and invested, both directly and indirectly, the income and the proceeds of the pattern of racketeering activity, to establish the RICO Enterprise in violation of 18 U.S.C. § 1962(a).

(467)   Defendant Kingdom of Saudi Arabia, as principal, agent of, and co-conspirator with Osama bin Laden and al Qaeda, maintained, directly and indirectly, an interest in and control of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

(468)   Defendant Kingdom of Saudi Arabia, as principal, agent of, and co-conspirator with Osama bin Laden and al Qaeda, maintained, directly and indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

(469)   Defendant Kingdom of Saudi Arabia, as a person associated with the RICO Enterprise, which engaged in acts of racketeering activity which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(d). It was part of the conspiracy that Defendant Kingdom of Saudi Arabia and co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions. It was a further part of the conspiracy that Defendant Kingdom of Saudi Arabia and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts done, in furtherance of the conspiracy.

(470)   Defendant Kingdom of Saudi Arabia violated 18 U.S.C. § 1962 (a-d) by investing in, maintaining an interest in, conducting and participating, directly and indirectly, or by conspiring

to do the same, in the RICO Enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, including but not limited to:

a)      18 U.S.C. § 1341 (mail fraud);

b)      18 U.S.C. § 1343 (wire fraud);

c)      18 U.S.C. § 1503 (obstruction of justice);

d)      18 U.S.C. § 1956 (money laundering);

e)      18 U.S.C. § 2339A (material support to organizations engaged in violent activities); and

f)      18 U.S.C. § 2339B (material support to designated foreign terrorist organizations)

(471)   The damages suffered by Plaintiffs, as described herein, were the direct and proximate result of the aforesaid pattern of racketeering activity by Defendant Kingdom of Saudi Arabia, acting individually and in concert with other members of the RICO Enterprise.

(472)   The loss of business and property by Plaintiffs includes loss of tangible and intangible personal property, loss of employment, personal effects, pecuniary losses, past and future wages and profits, business opportunities, personal property, support, funeral and burial expenses, and the other economic losses and hardships Plaintiffs incurred and experienced. Such losses were a direct and proximate result of the racketeering activities of Defendant Kingdom of Saudi Arabia.

**WHEREFORE,** Plaintiffs demand judgment against Defendant Kingdom of Saudi Arabia for an amount authorized by governing law to be determined at trial, together with treble damages, punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

**COUNT XIV**
**All Plaintiffs v. All Defendants**
**Violations of International Law**

(473)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(474)   Defendants are liable for Plaintiffs' injuries under the principles of international law.

(475)   It is long settled that the law of nations is part of federal common law, and that federal courts are empowered to address claims against those that commit, aid, or abet violations of international law.

(476)   The September 11th Attacks involved the hijacking of four airplanes. Aircraft hijacking is widely recognized as a violation of international law of the type that gives rise to liability against the hijackers and those who aided or abetted the aircraft hijacking.

(477)   Through the tortious acts in support of al Qaeda described above, Defendants aided and abetted, and conspired with, al Qaeda in the commission of a violation of international law, aircraft hijacking, because their conduct substantially assisted al Qaeda's commission of the September 11th Attacks.

(478)   In addition, and in the alternative, the tortious conduct of the Defendants aided and abetted the violation of the following conventions, agreements, U.N. declarations, resolutions, and principles of international law:

 (1) Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279;

 (2) Allied Control Council Law No. 10 (Dec. 20, 1945);

 (3) Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277;

 (4) Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287;

 (5) Hague Convention for the Suppression of Unlawful Seizure of Aircraft (Hijacking), Dec. 16, 1970, 22 U.S.T. 1641, 860 U.N.T.S. 105;

(6)     International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284 (entered into force May 23, 2001);

(7)     International Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 (entered into force April 10, 2002);

(8)     U.N. Security Council Resolution 1267, U.N. Doc. S/Res/1267 (Oct. 15, 1999);

(9)     U.N. Security Council Resolution 1373, U.N. Soc. S/Res/1373 (Sept. 28, 2001);

(10)    Protocol Additional (I) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 3;

(11)    Protocol Additional (II) to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflict, June 8, 1977, 1125 U.N.T.S. 609;

(12)    Statute of the International Criminal Tribunal for the Former Yugoslavia (ICTY), in Report of the Secretary-General pursuant to paragraph 2 of S.C. Res. 808, May 3, 1993, U.N. Doc. 8/25704, adopted unanimously by S. C. Res. 827, U.N. SCOR, 48th Sess., 3217th mtg., 16, U.N. Doc. S/PV.3217 (1993);

(13)    The Convention on the Prevention and Punishment of Crimes Against International Protected Persons, Including Diplomatic Agents, 28 U.S.T.  1975, T.I.A.S. No. 8532 (1977), implemented in 18 U.S.C. 1121;

(14)    The General Assembly Resolutions on Measures to Prevent International Terrorism, G.A. Res. 40/61 (1985) and G.A. Res. 42/159 (1987); and

(15)    The Convention on the High Seas, April 29, 1958, arts. 14-22 (piracy), 13 U.S.T. 2312, 450 U.N.T.S. 11.

(479)  Plaintiffs suffered injuries by reason of the above conduct for which Defendants are responsible.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for an amount authorized by governing law to be determined at trial, together with punitive damages, pre- and post-judgment interest, attorney's fees, costs of this action, and such other and further relief as the Court may deem appropriate under the circumstances.

**COUNT XV**

**All Plaintiffs v. All Defendants**
**Punitives**

(480)   Plaintiffs repeat and re-allege each and every allegation set forth above with equal effect as if alleged herein.

(481)   As set forth more fully above, all Defendants, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed, tacitly and/or expressly, to kill, severely injure, and/or inflict personal injuries upon the Plaintiffs.

(482)   As set forth above, all Defendants conspired and agreed to provide material support and resources to al Qaeda, and the bombers in furtherance of al Qaeda's overall goal to kill or injure American citizens and other persons present or employed at the Pentagon and the Twin Towers.

(483)   The Defendants' conspiracy resulted in the September 11th Attacks that killed, severely injured, and/or inflicted personal injuries upon the Plaintiffs.

(484)   Defendants' outrageous actions cannot be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

**WHEREFORE,** Plaintiffs demand judgment against all Defendants for an amount authorized by governing law to be determined at trial, together with pre- and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

March  9  , 2018

Respectfully submitted,

Caragh Fay (Bar No. 16955)
FAY LAW GROUP, PA
777 6th Street NW, Suite 410
Washington, D.C. 20001
(202) 589-1300
Caragh.Fay@faylawgroup.com

*Attorneys for Plaintiffs*